Janice C. NUNNERY, an Individual, Appellant,

v.

J. Richard BARBER, as an Individual, and in his official capacity as the West Virginia Alcohol Beverage Control Commissioner, Appellee.

No. 73–2502.

United States Court of Appeals, Fourth Circuit.

Argued April 4, 1974.

Decided Sept. 18, 1974.

Butzner, Circuit Judge, dissented and filed an opinion.

John Boettner, Jr., Charleston, W.Va., for appellant.

William R. Wooton, Asst. Atty. Gen. (Chauncey H. Browning, Jr., Atty. Gen., of West Virginia, on brief), for appellee.

Before BOREMAN, Senior Circuit Judge, and BUTZNER and RUSSELL, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

Plaintiff is a discharged manager of a state-operated liquor store in West Virginia. Contending her discharge was for patronage purposes and thereby violated her First Amendment rights, and was without due process, she sued the West Virginia Alcohol Beverage Control Commissioner both individually and officially for affirmative injunctive relief restoring her to her former position and for actual and punitive damages. She based federal jurisdiction on § 1983, 42 U.S.C., and § 1343, 28 U.S.C. The Commissioner moved to dismiss the action for want of jurisdiction under the Eleventh Amendment and for failure to state claim upon which relief could be granted. The District Court granted the motion on the second ground without considering the application of the Eleventh Amendment. Nunnery v. Barber

(D.C.W.Va.1973), 365 F.Supp. 691.[1] The plaintiff has appealed. We affirm.

The plaintiff's action represents a challenge to the "patronage" or "spoils" system of public employment.[2] Such an attack is not novel. For more than a century, the system has been under attack.[3] Generally the attack has been directed toward legislative action as the proper source of relief. And both federal and state governments have responded with civil service laws providing a merit system for public employment and giving public employees in certain classifications protection against discharge for patronage reasons.[4] West Virginia has enacted such a law.[5] When, however, resort has been had by public employees to the courts for relief independently of the legislated civil service laws or regulations, (i. e., by employees not within "the classified service") the claim has received scant consideration; and this has been true whether the claim was premised on the constitutional right of free speech, equal

protection or due process.[6] As the District Court in its opinion observed, the reason generally assigned for this denial of judicial relief is that the proper forum for relief is considered to be the legislature and not the courts. A recent case, expressive of this viewpoint and representing what until that time had been the uniform answer to this claim, is Alomar v. Dwyer, *supra*. In dismissing a claim of invalidity of a discharge of a non-policy-making public employee[7] for patronage reasons on constitutional grounds, the Court said (pp. 483–484 of 447 F.2d):

"The spoils system has been entrenched in American history for almost two hundred years. The devastating effect that such a system can wreak upon the orderly administration of government has been ameliorated to a large extent by the introduction of the various Civil Service laws. However, it is well understood that the victors will reap the harvest of those public positions still exempt from such

---

1. Since, as did the District Court, we find no merit in plaintiff's substantive claim, it is unnecessary for us to consider the defense of immunity under the Eleventh Amendment.

2. One of the early practitioners of the right was Jefferson, who remarked, in justification, "[I]f a due participation of office is a matter of right, how are vacancies to be obtained? Those by death are few; by resignation, none. Can any other mode than that of removal be proposed?" Padover, The Complete Jefferson (New York, The Tudor Publishing Co., 1943), p. 518.

3. The story of civil service reform is summarized in Arnett v. Kennedy (1974), 416 U.S. 135–139, 94 S.Ct. 1633–1639, 40 L.Ed.2d 15, decided April 16, 1974.

4. For a list of the civil service laws of the fifty states, *see* Broadrick v. Oklahoma (1973), 413 U.S. 601, 604–605, n. 2, 93 S.Ct. 2908, 37 L.Ed.2d 830.

   The purpose of such laws was described by the West Virginia Court in State ex rel. Karnes v. Dadisman (1970) 153 W.Va. 771, 172 S.E.2d 561, 568, thus:

   "Civil service laws are designed to afford to covered employees security of tenure."

5. West Virginia Code Ann. § 29–6–1 et seq.

6. Alomar v. Dwyer (2d Cir. 1971), 447 F.2d 482, cert. denied, 404 U.S. 1020, 92 S.Ct.

683, 30 L.Ed.2d 667; Moldawsky v. Lindsay (D.C.N.Y.1972), 341 F.Supp. 1393; Indiana State Employees Association, Inc. v. Negley (D.C.Ind.1973), 365 F.Supp. 225; Norton v. Blaylock (D.C.Ark.1968), 285 F.Supp. 659, affirmed, (8 Cir.) 409 F.2d 772; Young v. Coder (D.C.Pa.1972), 346 F.Supp. 165; American Federation of State, C. & M. Emp. v. Shapp (1971), 443 Pa. 527, 280 A. 2d 375.

Even though its thrust is that such dismissals are impermissible, the editor of the Note in 41 U.Chi.L.Rev. 297, 307 (1974) recognizes that such was the general rule. Thus, it states:

"Challenges to dismissal from public employment are not new. The courts, however, generally have refused to treat the patronage dismissal as a problem of free expression or equal protection. Their decisions instead either hold that the patronage employee has no constitutionally protected interest or conclude that whatever protection the first amendment affords against dismissal for reasons of political affiliation is waived by acceptance of a patronage job."

7. That employee involved was regarded as a "non-policy-making" employee, *see* Note, 57 Iowa L.Rev. 1320, 1330, n. 53.

laws. Indeed many such positions are exempt because a new administration taking office can only carry out its policies by replacing certain officeholders. If and when additional exempt positions are to be subject to civil service protection is a matter for action by the appropriate municipal and state authorities and not by a federal court."[8]

■■ A little over a year after the decision in *Alomar*, the Seventh Circuit, in a decision "without direct precedent", as several commentators have remarked,[9] departed from the accepted rule as stated in that case and for the first time granted constitutional protection of political association to patronage employees. Illinois State Employees Union, Council 34, etc. v. Lewis (7th Cir. 1972), 473 F.2d 561, cert. denied, 410 U.S. 928 and 943, 93 S.Ct. 1364, 1370, 35 L.Ed.2d 590, 609.[10] While the Court in this case accepted the premise that only the legislature may impose on the state a civil service system assuring impartiality in either the employment or retention of public employees, it held that such principle did not inhibit a court from prohibiting on constitutional grounds the dismissal of a patronage employee having no civil service status for patronage reasons.[11] Taking a realistic, rather than an abstract, view of the matter,

8. *Cf.,* Williams v. Illinois (1970), 399 U.S. 235, 261–262, 90 S.Ct. 2018, 2032, 26 L.Ed. 2d 586 (Harlan, J., concurring):

"However desirable and enlightened a theory of social and economic equality may be, it is not a theory that has the blessing of the Fourteenth Amendment. Not 'every major social ill in this country can find its cure in some constitutional "principle," and * * * this Court [is not equipped to] "take the lead" in promoting reform when other branches of government fail to act. The Constitution is not a panacea for every blot upon the public welfare, nor should this Court, ordained as a judicial body, be thought of as a general haven for reform movements.'"

9. Note, Patronage Dismissals: Constitutional Limits and Political Justifications, 41 U.Chi. L.Rev. 297, 316–7 (1974); Note, Public Employees—Freedom of Association—Discharge of Non-policy-making Public Employees' Freedom of Association, 26 Vand.L.Rev. 1090, 1097 (1973).

10. This case decided adversely to plaintiff's position as raised here that her discharge violated her due process rights to notice and hearing before discharge. It held that under *Roth,* [Board of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L. Ed.2d 548], a public employee has no "liberty" or "property" right to continued employment unless it can be said he had "a legitimate claim of entitlement to it." It concluded that, "[O]ne who takes a 'patronage' job may not even have an expectation of keeping it when the appointing officer is replaced, let alone a 'legitimate claim of entitlement' to such a job." It, also, disposed of any claim by the plaintiff because her discharge damaged her "good name, reputation, honor or integrity" with the statement that, "[W]e assume that the loss of a patronage job would in no sense reflect adversely on the discharged employee's reputation." (473 F.2d at pp. 563–564, n. 1) We find, as did the District Court, this reasoning conclusive of any claim advanced by the plaintiff of a violation of due process rights.

11. The Court said: "Neither this court nor any other may impose a civil service system upon the State of Illinois." (473 F.2d at p. 567)

Ironically, the distinction, as made by the Court, between the right to impose by judicial fiat a civil service system and the right, in the exposition of constitutional claims, to accomplish substantially the same result—at best a subtle one—if sound, would have made largely unnecessary much of the long and arduous struggle, step by step, to secure in the first instance civil service legislation establishing impartiality "in * * * appointment and term of place" for public employees covered thereby and thereafter to broaden the scope of the law and would have made superfluous the successive additions made by the various Presidents to the classifications of employees who were protected under the Act as well as would have made invalid the various transfers of certain positions from the civil service to an "excepted" class, transfers that have been made from time to time since the enactment of the Act. Such distinction is in a way suggestive of a modern tendency to construct novel and abstruse constitutional theories to serve as instruments with which it is hoped the judiciary, under the guise of constitutional interpretation, will correct an alleged political or

however, the Court made it clear that this was not an absolute rule applicable in all cases; it was a rule which the Court expressly held did not extend protection to all public employees.[12] On the contrary, the constitutional principle was declared to establish a flexible rule that varied in its application with the classification of the employee and the nature of his duties. There were, and of necessity had to be, exceptions to the rule; there were, the Court freely conceded, classes of public employees who were not entitled to invoke the constitutional principle it was enunciating. Thus, it emphasized in its opinion that it did not "challenge the public executive's right to use political philosophy or affiliation as one criterion in the selection of policy-making officials. Moreover, considerations of personal loyalty, or other factors besides determination of policy, may justify the employment of political associates in certain positions. It is difficult to believe, however, that any such justification would be valid for positions such as janitors, elevator operators or school teachers. Thus, again, jurisdiction is a matter of proof, or at least argument, directed at particular kinds of jobs. The possibility of such valid justification for some positions does not afford a basis for dismissing all of plaintiffs' claims without a trial." (473 F.2d at p. 574)

The Court stated throughout its opinion that the rule it was expounding related only to the rights of "maintenance workers, elevator operators; janitors, and comparable employees", or, as it expressed it at another point, of "janitors, elevator operators or school teachers", (473 F.2d at pp. 574–575) employees who normally cannot in their employment adversely affect the policy-making or implementation functions of government and employees "performing merely routine functions not requiring the exercise of an informed discretion or the formulation of underlying rationales for government action." Indiana State Employees Association, Inc. v. Negley, *supra* (365 F.Supp. at p. 232). In short, *Lewis*, it seems fair to assume, was intended to extend its mantle of constitutional protection only to those public employees whose duties were "routine", involving the exercise of no administrative policy or public duties as broadly de-

---

social evil which, though properly the subject of legislative reform, the legislature has neglected to remedy or has moved with too "tardy a step." It was this tendency which Justice Harlan criticized in *Williams, supra,* and to which Chief Justice Burger perceptively referred in United States v. Richardson (1974), 418 U.S. 166, p. 179, 94 S.Ct. 2940, 41 L.Ed.2d 678, decided June 25, 1974.

It is true that civil service progress, as accomplished through legislative action, has been gradual and its benefits have been slowly extended over the years. The slow development of civil service is well illustrated in the federal record of legislation. At the outset, the Pendleton Act, adopted in 1883, was extended to scarcely more than ten per cent. of the federal employees, and these occupied relatively unimportant clerkships ranging in salary from $900 to $1,800 a year. Gradually, the coverage was extended, though at the time Cleveland began his first Presidency 88% of the federal employees were unprotected (or, as it was generally stated, held "excepted" positions) and,

of these he dismissed 68% in order to make way for patronage appointments. In 1953 President Eisenhower rearranged the coverage of the Act, set up the "excepted" classes of employees, and, incident to these steps, transferred certain formerly competitive service positions over to the "excepted" classifications. As a result 86% of all federal employees came under civil service protection. Cooke, Biography of an Ideal (Government Printing Office, 1958) pp. 57–62. But whether progress has been slow or fast, if the remedy for civil service reform lies within the jurisdiction of the legislature, the judiciary is obligated to respect that legislative jurisdiction. Legislative inaction or "benign neglect" in a field committed to legislative control will not transfer jurisdiction to act to the judiciary.

12. *Cf.,* CSC v. Letter Carriers (1973), 413 U.S. 548, 567, 93 S.Ct. 2880, 2891, 37 L.Ed. 2d 796.

"Neither the right to associate nor the right to participate in political activities is absolute in any event."

fined, and that is the reach of the decision on this point, as we read it.[13]

It is true, the opinion in *Lewis* may be thought to make a vague distinction between what it describes as "policy-making" employees and "non-policy-making" employees and does indicate that its rule extends generally to "non-policy-making" employees. But the Court attempted no authoritative or precise definition of "policy-making" and "non-policy-making"; and these terms as used in the opinion, contribute little to determining with exactness or finality those employees who are or are not entitled to the protection of the rule the Court is promulgating. As the editor in 14 Wm. & Mary L.Rev., 720 at 729–30, commenting on this case, phrased it, "[A] related problem is that of defining the protected class. The most common proposal is that persons in policy making positions be excluded. Such a distinction proves simple at either end of the employment spectrum, but would be almost impossible to accomplish where the groups shade together."

Judge Campbell in his concurring opinion also recognized the "definitional problem" represented in attempting to fix the application of the rule by the use of such broad, general terms as "policy-making" and "non-policy-making". He stated the problem in these words:

" * * * It is simple enough to say that janitors, clerk-typists and elevator operators are 'non-policy making' employees, but how far up in the bureaucratic echelon can the distinction be judicially drawn? What, about a janitorial supervisor, the director of a stenographic pool, a personnel manager, a deputy assistant division head, a deputy director, or even a secretary to a top echelon director or department head who may have access to confidential information? As Judge Stevens so aptly states, there may be instances when political affiliation constitutes a proper qualification for public employment, particularly in the selection and appointment of 'policy-making' officials. Indeed, no one has challenged the right of an

---

13. This, it would appear, is the construction put on the decision by even those commentators who argue that patronage dismissals are constitutionally impermissible. They, too, conclude that the constitutional principle that would invalidate such dismissals is not to be extended indiscriminately to all public employees but, on the contrary, can be invoked by only certain groups of public employees. In the Note in 41 U. of Chi.L.Rev., *supra*, at p. 319, the author concedes that "personal loyalty is sufficient to justify political dismissals at the policy-making level, and that the patronage dismissal is unconstitutional only with regard to non-policy-making employees."

Similarly, in the Note, Political Patronage and Unconstitutional Conditions: A Last Hurrah for the Party Faithful? 14 Wm. & Mary L.Rev. 720 (1973), the author would confine any rights arising out of refusal to hire or dismissal for patronage reasons to "lower level personnel, who are not considered participants in the formulation or supervision of administration policies" and are "unprotected by any civil service system."

The author in the Note, A Constitutional Analysis of the Spoils System—The Judiciary Visits Patronage Place, 57 Iowa L.Rev. 1320, 1321, n. 12 (1972), also, would restrict his views of the rights of public employees

to be protected from patronage dismissals to "subordinate governmental officials, who perform mere administrative duties and exercise little or no discretion", and "are seldom held directly accountable to the appointing executive * * *" and "do not operate in sensitive areas."

This limited application of *Lewis* was underscored in Gould v. Walker (D.C.Ill.1973), 356 F.Supp. 421. There the Court construed the rule in *Lewis* as restricted to "positions such as clerks, janitors and license examiners" and did not apply to an "employee with substantial responsibility and authority." (Page 423) It concluded that it was "hard pressed to articulate a more helpful standard" for determining the employees entitled to the benefit of the rule than the one enunciated by Judge Campbell [*quoted infra*] (Page 425).

*See, also*, Adams v. Walker (7th Cir. 1974), 492 F.2d 1003, 1007.

*Cf.*, Jannetta v. Cole (4th Cir. 1974), 493 F.2d 1334, involving the First Amendment rights of a city fireman, which certainly is a "routine" type job, involving no policy functions, however, "policy-making" be defined, and which was not a patronage job but one apparently acquired after a merit examination; *see*, however, Arnett v. Kennedy, *supra*.

elected official to appoint to such positions and for whatever reasons he deems proper, persons in whose loyalty and competence he has the highest confidence. The difficulty arising in attempting to fashion an appropriate and workable judicial standard for distinguishing between 'policy-making' and 'non policy-making' positions. In my judgment, the constitution would permit a public official to hire or dismiss on the basis of political association any employee engaged directly or indirectly in the formulation or implementation of the policies of the particular governmental office or agency. A more precise standard is difficult to articulate and thus the true impact of today's decision must necessarily await case by case determination." (473 F.2d at p. 578)

Moreover, the lead opinion was at pains,[14] it would seem, to indicate it was not using the term "policy-making" as an absolute criterion in the application of its rule. It unquestionably envisaged a broader basis for immunity from the rule. This was made clear by the opinion in Indiana State Employees Association, Inc. v. Negley, *supra*, where the Court, quoting from the pertinent language of *Lewis*, said (365 F.Supp. at pp. 231–232):

"Plaintiffs' reliance on the distinction between policy-making and non-policy-making positions arises from language in *Lewis* wherein the Court stated: 'Plaintiffs properly do not challenge the public executive's right to use political philosophy or affiliation as one criterion in the selection of policy-making officials.' Such reliance is nearsighted in that it ignores the succeeding sentence in the opinion which states that 'Moreover, considerations of personal loyalty, or other factors besides determination of poli-

cy, may justify the employment of political associates in certain positions.' Though these plaintiffs clearly occupied policy-making positions, the Court foresees that many cases could arise wherein such a distinction could not practically be made. In those cases consideration of 'other factors' would be appropriate. If such a distinction must be made, a more useful, and more accurate, one to be drawn from *Lewis* would be the distinction between employees performing or exercising public duties as opposed to those performing merely routine functions not requiring the exercise of an informed discretion or the formulation of underlying rationales for government action."

As we have observed, it seems fairly manifest that the majority in *Lewis* intended to restrict its holding to a particular group of employees ("maintenance workers, elevator operators, janitors, and comparable employees") and proposed to promulgate no authoritative definition of the type of other employees who were entitled to protection under its ruling. So clear is this intent that it has been remarked that, "[I]t is apparent that the court of appeals intended to limit *Lewis* to its facts" and to the class of employees who performed "routine services". Indiana State Employees Association, Inc. v. Negley, *supra* (365 F. Supp. at p. 232). Actually, it would appear the Court was in its decision seeking to make the same distinction among employees and their rights which Justice Douglas made in his dissent in United Public Workers v. Mitchell (1947) 330 U.S. 75 at pp. 120–122, 67 S.Ct. 556, 581, 91 L.Ed. 754. There, he concluded that the Hatch Act should apply to those public employees who "may be a tributary, though perhaps a small one, to the main stream which we call policy mak-

---

14. We refer to Judge Stevens' opinion as the lead, rather than the prevailing, opinion, because there are some differences, however subtle, between his opinion and the concurring opinion of Judge Campbell. To deter-

mine the actual holding of the majority of the panel, it is necessary to read the two opinions together, as balanced against the dissenting opinion of Judge Kiley.

ing or administrative action", a class that could even include "clerks, stenographers and the like", if so identified with "policy making or administrative action", but should not apply to "a skilled laborer or artisan whose work or functions in no way affect the policy of the agency nor involve relationships with the public". And the dissenting opinion in American Federation of State, C. & M. Emp. v. Shapp, *supra* (280 A.2d at pp. 381–382), made the same point: Accepting the premise that it was "consonant with constitutional protections, to allow a new governor to dismiss, merely because of political affiliation, any employe who is engaged in a policy making position, or in a position charged with implementing or devising the means of implementing the governor's policies", it would have held such rule inapplicable to "unskilled and semi-skilled employes whose daily occupations are merely to maintain the public highways."

Because of these difficulties in defining the protected class, Judge Campbell, in his concurring opinion, expressed considerable concern that the federal courts might, if the rule enunciated was given too broad an application, be converted into "super civil service commissions" and voiced doubt whether for these reasons the courts were as well qualified as the legislature to define what constituted a "policy-making" or an "excepted" position in the application of the constitutional principles being enunciated. (473 F.2d at p. 578) His doubts have been echoed by a number of commentators. Thus, in 26 Vand.L.Rev. 1090, 1097–8 (1973), the note editor observes:

"* * * A second definitional problem is created by the court's restriction of the decision's scope to non-policy-making employees. Perhaps, as was noted by Judge Campbell,

the difficulties inherent in delineating any workable standards for making this characterization of public employees are such that they should be resolved legislatively."

We find convincing the point that the delineation between the employees who are and who are not protected from patronage discharge poses an issue which should be resolved legislatively, not judicially, and that the legislative determination, when made, should be overturned only if it can be said that it is palpably arbitrary or irrational. Such a conclusion, it would seem, fits in with the procedure established under the federal civil service laws, which have formed the pattern for the state civil service laws, including that of West Virginia. The Lloyd-La-Follette Act,[15] which supplements the Pendleton Act of 1883,[16] and as implemented under the Regulations of the Civil Service Commission,[17] provides protection for federal employees in the "competitive service" against discharge for political reasons. But whether a federal employee is in the "competitive service" and entitled to that protection depends on federal statute and the regulations of the Civil Service Commission, acting by delegation from the President. Federal employees who occupy positions which (a) are of a confidential or policy determining character, or are, while not of a confidential or policy determining character, of a type (b) for which it is not practicable to examine, or (c) it is not practicable to hold a competitive examination, are expressly excepted from the "competitive service" and may be terminated at will for any cause. The Civil Service Commission, as the selected agency of the executive branch, is given the authority in turn "to determine finally whether a position is in the com-

---

15. 5 U.S.C. § 7501. This Act has been described as the "antigag law" and was intended to correct certain injustices to postal service employees which came to light during President Taft's administration. Cooke, *supra*, p. 69.

16. 22 Stat. 403, 5 U.S.C. § 3301 et seq.

17. Executive Order No. 10577, 19 F.R. 7521, as amended 20 F.R. 8137, 21 F.R. 1956, 21 F.R. 6377, 22 F.R. 10025, 25 F.R. 2073.

petitive service" and to "decide whether the duties of any particular position are such that it may be filled as an excepted position" or patronage position. By like token, it would appear that the state legislature, subject only to the requirement that it should not act arbitrarily or irrationally, should have the same authority to determine whether under a state civil service law a state position involves the exercise of such "public duties" that patronage dismissal therefrom would not be improper. The legislature of West Virginia has made that determination with respect to the plaintiff's position, a determination that should be given the same weight and finality accorded an exception made for federal employees by the Civil Service Commission.[18] It assuredly cannot be said that the designation by the West Virginia legislature of plaintiff's position as a patronage job, terminable at will as such, was either arbitrary or irrational. Liquor control is always a sensitive issue in government and requires strict supervision and control. This is well recognized. *Cf.,* California v. LaRue (1972) 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342. The manager of the county liquor store is in a far more sensitive position than the holders of the several specified positions instanced by Judge Campbell in his concurring opinion; it plainly is not a "routine" position. It, it would seem, is the type of position that the legislature could properly exempt, and that Judge Campbell thought it could exempt, from the "classified service", just as the Civil Service Commission, under its Congressional mandate, exempted federal positions from the federal "classified service."

The plaintiff argues, though, that the District Court made a finding of fact that her position was "non-policy-making" and was within the *Lewis* rule, if that rule should be considered controlling. And she contends that such a finding may be overturned only if clearly erroneous. There is no question that a factual finding made by the District Court on disputed facts is binding on appeal unless clearly erroneous. But that principle is not involved here. We do not construe the use by the District Court of the term "non-policy-making" employee as amounting to a factual finding that the plaintiff was such an employee. Rather, we would read its use as a means of putting the issue within the frame of the *Alomar* rule which it proposed to follow. If, however, it is to be regarded as a finding of fact, it has no support or basis in the record. Indeed, the District Court gave no reason for such a finding, if finding it was; it made no effort to analyze the plaintiff's position in the light of the criteria discussed in *Lewis*. The plaintiff herself, though she relied on *Lewis* for her claim, nowhere alleged that her employment was in a non-policy type position. Nor did the defendant make any suggestion in the motion to dismiss to that effect. The record is accordingly barren of any basis of any kind for a finding by the District Court that the plaintiff was in a non-policy-making position. In our opinion, the record as made by the

18. W.Va.Code, Ch. 29, Art. 6, § 2 (Michie Repl. Vol. 1971), dealing with the West Virginia Civil Service System, provides, in pertinent part:

"The governor may, by executive order, with the written consent of the civil service commission and the appointing authority concerned, add to the list of positions in the classified service, but such additions shall not include the following:

"(11) Managers and clerks of liquor stores."

W.Va.Code, Ch. 60, Art. 2, § 12 (Michie 1966), deals with the Alcohol Beverage Control Commissioner and provides:

"The commission shall appoint or employ such assistants and employees as may be necessary to the efficient operation of the department and fix their salaries. All assistants and employees shall be appointed or employed to serve during the will and pleasure of the commission."

Positions in the Alcohol Beverage Control Department, other than the excepted ones, are generally under civil service. *See,* State ex rel. Karnes v. Dadisman, *supra.*

plaintiff herself and the legislative declaration fix her type of employment as one without the rule in *Lewis*.

It should be noted, also, that, if the argument of the plaintiff is accepted, her initial employment would be as invalid constitutionally as her subsequent discharge. If political affiliation cannot be justified constitutionally as a basis for discharge, it would seem to follow that granting employment itself on such a basis is invalid. The complaint is clear that the plaintiff received her position because of her Republican party affiliation. Hers was a definite patronage appointment. Beyond this, she alleged categorically that "her employment and *continued employment* as manager and cashier as described herein was conditioned upon active and partisan support, past, present and future, of the Republican Party in local, state and national elections." (Italics added) [19] In her brief filed in this Court, the plaintiff asserts that at the time she was offered the non-civil service position of manager as a patronage job pure and simple, she was offered the alternative of cashier, a civil service position with tenure. She voluntarily accepted the patronage position, with a full realization of its conditions and its hazards. The question naturally arises whether, irrespective of the validity or invalidity of attaching political consideration to either the granting or the continuance of public employment, one who obtains a position knowingly and understandingly as a purely political appointment is in any position to complain if he or she loses his or her position in the same manner and for the same reason by which he or she originally secured it.

This problem was faced in *Lewis*. The Court recognized that it could be well argued that a public employee who "accepted his job with knowledge that he would be fired if, and when, the appointing officer was replaced by a member of the opposite political party * * * waived any right to object to the fully anticipated event which has now come to pass." (473 F.2d at p. 573) The Court found, however, that there was not sufficient "factual basis" for a defense of this character in the case under consideration and did not feel compelled to determine whether such defense was sound.[20] However, the Court in American Federation of State, C. & M. Emp. v. Shapp, *supra*, did, it would seem, resolve this issue and resolved it adversely to the plaintiff's position. In denying to patronage employees, who had obtained through political affiliation their jobs relief from discharge, the Court stated tersely that those who "live by the political sword must be prepared to die by the political sword" and, in dying by the political sword, acquire no constitutional right to relief. It phrased its conclusion thus (280 A.2d at p. 378):

> "We specifically hold that State employees who obtained their positions (jobs)—*as all the parties agree they did*—by politics or party patronage, and complain of being fired solely on the grounds of political sponsorship or affiliation, have (1) no Constitutionally ordained right of procedural Due Process, (2) nor any other Constitutionally protected right to their jobs under (a) either the Federal or (b) the State Constitution, (3) nor any right claimed herein under any (a)

19. This reference to her position as one both of "manager and cashier" seems in error, since, in her brief in this Court, she has referred to the two positions as separate positions, one of which has protected tenure (cashier) and one has not (manager). She alleged she was given her choice of the two positions.

20. *Cf.*, Bond v. County of Delaware (D.C. Pa.1973) 368 F.Supp. 618, 628:

"A distinction in the case *sub judice* is that plaintiff alleges he began employment unaware that the job was a 'patronage' job."

Even had the plaintiff in this case not made her specific allegations of knowledge, it is doubtful she could maintain a claim of innocence in face of the statute that made plain, it would seem, that her position was a "patronage job."

Federal or (b) State Statute." [Emphasis in opinion] [21]

■ We are of opinion the plaintiff by her own allegations disqualified herself from claiming any right to complain of her discharge. She knew from the outset she was entitled to no civil service status. In fact, she had been given, as we have observed, a choice between a civil service status and one dependent on political activity, and had voluntarily chosen the latter, knowing, as she herself alleges, the hazards of the choice she took. If there were ever a case in which it could be said an employee had waived a right of complaint, this, it would seem, is that case.

Nor do we find any support for plaintiff's contention in Perry v. Sindermann (1972), 408 U.S. 593, 93 S.Ct. 2694, 33 L.Ed.2d 570, even though she places great reliance on that authority. That case involved a college teacher, who had not been employed as a patronage employee and whose initial or continued employment was in no way dependent on political affiliation or activity. The teacher specifically "alleged that he had *de facto* tenure under contract law due to 'the existence of rules or understandings' with the college which employed him," and that was the true basis on which the Court found that, if proved, he had a cause of action. Arnett v. Kennedy, *supra* (White, J., concurring and dissenting). We have no such situation here; indeed, we have the very opposite. The plaintiff concedes she had no right to tenure in her job. Though irrelevant to the issue here, it perhaps is not amiss to add that even when a public employee enjoys tenure and is as "a federal employee in the competitive service, entitled, by statute, to serve in his job without fear of dismissal except for cause,"[22] it has been decided "that in certain situations the discharge of a government employee may be based on his speech without offending guarantees of the First Amendment." Arnett v. Kennedy, *supra*, 416 U.S. at p. 160, 94 S.Ct. at p. 1647.

■ In short, it would seem that, however plaintiff's claim be viewed, it is without validity. Unquestionably, as the plaintiff herself concedes, *Alomar*—an authority whose reasoning we find persuasive—would bar relief. But *Lewis* offers no better avenue for relief. It is difficult to fit the position of the plaintiff within the range of positions around which *Lewis* placed a protective hedge. Her position was in no way similar to that of "maintenance workers, elevator operators, janitors and comparable employees" as in *Lewis*, or to the "unskilled and semi-skilled employees whose daily occupations are merely to maintain the public highways", whose rights against patronage dismissal the dissenting opinion in *Shapp* would protect, or "a skilled laborer or artisan whose work or functions in no way affect the policy of the agency nor involve relationships with the public," which are included within the class Justice Douglas found entitled to constitutional protection against First Amendment restraints in *Mitchell*. Moreover, her awareness that her position was a patronage job and that she accepted it voluntarily with full understanding that, granted on the basis

21. The "theory" that a patronage employee who accepts his employment on the express understanding, as the plaintiff in this case avers she did, that it may be terminated for the same reasons on which it was given was, it is true, criticized in the Note, 41 U. of Chi.L.Rev. 297, 312, et seq. The author of the Note, however, concedes that, "[A]lthough it has not been widely employed, the theory merits consideration *because of its apparent validity*" [Italics added] (Page 312, n. 73). It dismissed the claim with the statement that "it is not rational to believe that a waiver of the right not to be dismissed for political reasons is voluntary." (Page 314) It is, of course, difficult, if not impossible, to reconcile this conclusion with the many cases in which voluntary waiver of favored constitutional rights has been upheld in *habeas* cases.

22. Arnett v. Kennedy, *supra* (Marshall, J., dissenting).

of patronage, it was terminable on that same basis, gives her no right to complain of her patronage dismissal. The District Court accordingly committed no error in dismissing the action.

Affirmed.

BUTZNER, Circuit Judge (dissenting):

I would vacate the judgment of the district court and remand this case for trial.

While Mrs. Nunnery's complaint is not altogether clear, there is no question that she held a patronage job without tenure.[1] She claims that she worked satisfactorily but was nevertheless discharged because she did not actively support the political party that procured her appointment. This, she charges, violated her rights of free political expression and association guaranteed by the first and fourteenth amendments.

The district court conducted no evidentiary hearing. Quoting the epigram, "Those who, figuratively speaking, live by the political sword must be prepared to die by the political sword," [2] it held that her complaint failed to state a claim upon which relief could be granted. This court now affirms. I believe both courts have erred by grounding their decisions on Mrs. Nunnery's lack of tenure instead of on the constitutional rights accorded her by the first and fourteenth amendments.

Mrs. Nunnery's lack of a property interest in her job affects her right to procedural due process. Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). It does not in itself defeat her claim that her discharge was an unlawful retaliation for her exercise of first and fourteenth amendment rights. The constitutional limitations on a state's power to discharge a person whose employment is otherwise terminable at will are clearly explained in Perry v. Sindermann, 408 U.S. 593, 596, 92 S.Ct. 2694, 2697, 33 L. Ed.2d 570 (1972):

> "The first question presented is whether the respondent's lack of a contractual or tenure right to re-employment, taken alone, defeats his claim that the nonrenewal of his contract violated the First and Fourteenth Amendments. We hold that it does not. ··

> "For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' . . . Such interference with constitutional rights is impermissible.

> "We have applied this general principle to denials of tax exemptions . . . unemployment benefits . . . and welfare payments . . . But, most often, we have applied the principle to denials of public

---

1. I find it unnecessary to explore the dispute between the district court and this court over whether her duties involved making policy. That cannot be decided until after the presentation of evidence, and it is relevant only to the district court's duty to balance the respective interests of Mrs. Nunnery and the state. ·

2. *See* Nunnery v. Barber, 365 F.Supp. 691, 695 (S.D.W.Va.1973). The quotation is from American Fed. of State, County, and Municipal Employees v. Shapp, 443 Pa. 527, 529, 280 A.2d 375, 378 (1971).

employment . . . We have applied the principle regardless of the public employee's contractual or other claim to a job. . . .

"Thus, the respondent's lack of a contractual or tenure 'right' to reemployment for the 1969–1970 academic year is immaterial to his free speech claim. Indeed, twice before, this Court has specifically held that the nonrenewal of a nontenured public school teacher's one-year contract may not be predicated on his exercise of First and Fourteenth Amendment rights . . . We reaffirm those holdings here."

*Perry* thus exposes the error of dismissing Mrs. Nunnery's suit simply because she lacked tenure. The defense of waiver is equally fallacious. *Perry* and its precedents teach that a state cannot condition a benefit, including a job, on the surrender, or waiver, of one's constitutional rights. *See, e. g.,* Torcaso v. Watkins, 367 U.S. 488, 495, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); Alston v. School Board, 112 F.2d 992, 998 (4th Cir. 1940). In sum, the crux of this controversy is the nature of a public employee's first amendment rights, not lack of tenure.

The Supreme Court has ruled that the state, as an employer, has a greater interest in regulating the speech of its employees than in regulating the speech of other citizens. This interest is confined, however, to the reasonable needs of promoting the efficiency and integrity of public service. While deference is to be paid to the public employer's judgment, the courts have a duty to weigh the state's needs against the employee's rights as a citizen. Pickering v. Board of Education, 391 U.S. 563, 569, 88 S.Ct.

1731, 20 L.Ed.2d 811 (1968). The balance must include both the rights which the employee seeks to exercise and the responsibilities of her job. The state's requirements may include, for example, the need for loyal and sympathetic employees in positions of discretion, the need to ensure obedience to state policy, and the need to prevent impropriety or its appearance. *See Pickering, supra,* at 570 n. 3, 88 S.Ct. 1731; Note, Patronage Dismissals: Constitutional Limits and Political Justifications, 41 U. Chi.L.Rev. 297, 319–325 (1974). Thus, what would be impermissible speech or conduct in one position may be acceptable for an employee holding another.

When a neutral statute, such as the Hatch Act, regulates the political activity of public employees, courts defer to the legislature's perception of the state's interest. *See, e. g.,* United States Civil Service Comm'n v. National Assn. of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). But no West Virginia statute compels a public employee to undertake purely partisan tasks at variance with his political beliefs; indeed, the constitutionality of such a statute would be dubious. If a state official commands partisan service under penalty of dismissal,[3] I believe he should be required to demonstrate how the state's interest—as distinct from the party's—will be legitimately advanced by the suppression of the employee's first amendment rights. Illinois State Employees' Union v. Lewis, 473 F.2d 561 (7th Cir. 1972), cert. denied, 410 U.S. 928, 943, 93 S.Ct. 1364, 1370, 35 L.Ed.2d 590, 609 (1973). *Contra* Alomar v. Dwyer, 447 F.2d 482 (2nd Cir. 1971), cert. denied, 404 U.S. 1020, 92 S.Ct. 683, 30 L.Ed.2d 667 (1972).

---

3. "While criminal sanctions and damage awards have a somewhat different impact on the exercise of the right to freedom of speech from dismissal from employment, it is apparent that the threat of dismissal from public employment is nonetheless a potent means of inhibiting speech." Pickering v. Board of Education, 391 U.S. 563, 574, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968).

Therefore, I would remand the case for a trial at which Mrs. Nunnery must carry the initial burden of showing that she has been deprived of her right to free political association or speech. If the proof shows that Mrs. Nunnery's refusal to perform party chores did not arise from principled disagreement with the ideology of the party, but, on the contrary, stemmed from mere unwillingness to exert herself, the district court should dismiss her suit. She cannot complain because her party-oriented boss prefers a party stalwart who will perform party chores over one who will not. The first amendment assures her right to freedom of speech and association, but if these rights have not been placed in jeopardy, it affords Mrs. Nunnery no protection for her job.

On the other hand, if Mrs. Nunnery's proof establishes that her discharge resulted from her refusal to do party chores because she disagreed with the political tenets of the party, her employer must demonstrate that the state—as distinguished from the party—had a legitimate interest in her performance of these chores that outweighed her first amendment rights. If the state lacked such an interest, the district court should find for Mrs. Nunnery on this issue. This would not, as the employer argues, impose a civil service system on the state. West Virginia is not required to give any assurances of tenure which would make the job a property right. *See* Arnett v. Kennedy, 416 U.S. 134, 155–156, 94 S.Ct. 1633, 1645, 40 L.Ed.2d 15 (1974). It may discharge for other good cause despite an employee's first amendment claim. Kirker v. Moore, 436 F.2d 423 (4th Cir. 1971). But its power to discharge cannot trench on rights secured by the first and fourteenth amendments even though the employee may otherwise be fired at will. Perry v. Sindermann, 408 U.S. 593, 596, 93 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).