Clarence RAMEY, James Bledsoe, David Curtis Minton, Chester Fugate, Herschel Woodward, Onza Collier, Danny Moore, Ronnie Fortner, James Hensley, Muriel Gibbons, James Hamilton, Marion Hobbs, Appellees,

v.

Paul T. HARBER, Individually and as Sheriff of Lee County, Appellant,

and

Board of Supervisors of Lee County, W. Quentin Littrell, Individually and as member, Roy Lucas, Individually and as member, Ralph Robinette, Individually and as member, C. B. Waddell, Individually and as member, J. K. Newman, Individually and as member, Bill Jessee, Individually and as member, W. R. Hines, Individually and as member, A. T. Burchette, Individually and as member, Defendants.

Clarence RAMEY, James Bledsoe, David Curtis Minton, Chester Fugate, Herschel Woodward, Onza Collier, Danny Moore, Ronnie Fortner, James Hensley, Muriel Gibbons, James Hamilton, Marion Hobbs, Appellants,

v.

Paul T. HARBER, Individually and as Sheriff of Lee County, Board of Supervisors of Lee County, W. Quentin Littrell, Individually and as member, Roy Lucas, Individually and as board member, Ralph Robinette, Individually and as member, C. B. Waddell, Individually and as member, J. K. Newman, Individually and as member, Bill Jessee, Individually and as member, W. R. Hines, Individually and as member, A. T. Burchette, Individually and as member, Appellees.

Clarence RAMEY, James Bledsoe, David Curtis Minton, Chester Fugate, Onza Collier, Danny Moore, James Hensley, Muriel Gibbons, James Hamilton, Appellants,

v.

COUNTY OF LEE VIRGINIA, Board of Supervisors of Lee County, Virginia, W. Quentin Littrell, Roy Lucas, Ralph Robinette, C. B. Waddell, J. K. Newman, Bill Jessee, Jack Lee, A. T. Burchette, W. R. Hines, Appellees.

Nos. 77–1927, 77–1928 and 78–1010.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 4, 1978.

Decided Dec. 15, 1978.

K. K. Hall, Circuit Judge, filed a concurring opinion.

Walton D. Morris, Jr. and Gary S. Bradshaw, Big Stone Gap, Va. (Bradshaw & Morris, Ltd., Big Stone Gap, Va., on brief), for appellants.

Edgar Bacon, Larry Lewis, Jonesville, Va., James P. Jones and Stephen M. Hodges, Abingdon, Va. (Penn, Stuart, Eskridge & Jones, Abingdon, Va., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, COWEN *, Senior Judge, and HALL, Circuit Judge.

COWEN, Senior Judge:

The appellants, hereinafter the deputies or plaintiffs, held positions as deputy sheriffs in Lee County, Virginia, until December 31, 1975. Deputy sheriffs in Lee County are nonconfidential, nonpolicymaking public employees. The plaintiffs were appointed as deputy sheriffs by Curtis H. Flanary, a Republican who was elected sheriff in the general election of November 1971. His term was 4 years and he held that office from January 1, 1972 through December 31, 1975. Under the Virginia statute (section 15.1–48 of the Code of Virginia,

* Wilson Cowen, Senior Judge of the Court of Claims, sitting by designation.

1950, as amended), the deputies of Virginia sheriffs hold office only during the term of the sheriff who appointed them. Pursuant to that statute and in accordance with the custom that had prevailed for decades in Lee County and many other small counties in Virginia, Mr. Flanary hired an entirely new set of deputies, retaining none of those who had served under his predecessor, a Democrat.

In the general election of November 1975, Mr. Flanary was opposed by the appellee, Paul T. Harber, hereinafter Sheriff Harber or defendant, who ran as a candidate of the Democratic party. Lee County has a history of spirited partisan political battles, and the two major parties have been almost equally strong over the years.

Sheriff Harber won the election and as part of his plan to assume office on January 1, 1976, he issued application forms to all individuals who indicated an interest in the position of deputy sheriff. Only one of the plaintiffs made a formal application. All of the outgoing deputies had actively campaigned for the incumbent Flanary. Most of the plaintiffs had expressed an active interest in the status of their jobs. This resulted in some friction between the deputies and Sheriff-elect Harber, who informed them that their status was solely the concern of their principal, Sheriff Flanary, and that their continued employment was not a matter for Harber's comment. None of the plaintiffs was reappointed by Sheriff Harber. He refused to reappoint them solely because of their political beliefs and affiliations.

On June 28, 1976, 6 months after Sheriff Harber took office, the Supreme Court announced its decision in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), which held that the discharge of a nonconfidential, nonpolicymaking employee under a patronage system was a violation of the Constitution. A few months later, in September 1976, the ten Republican deputies of former Sheriff Flanary filed this suit, alleging that Sheriff Harber's course of conduct operated to deprive them of

rights guaranteed under the First and Fourteenth Amendments to the Constitution. The original action was brought pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 1988. They sought injunctive and declaratory relief, permanent reinstatement in their former positions, back pay, attorneys' fees, and costs. The district court denied a preliminary injunction, but granted an expedited trial.

The district court dismissed the action as to the governing body of Lee County which had been joined in the suit against Sheriff Harber. However, in an opinion filed April 21, 1977,[1] the district court, relying on *Elrod v. Burns, supra,* held that the constitutional rights of the deputies had been violated and directed Sheriff Harber to reinstate and hire the deputies as his own, and to pay attorneys' fees of $15,000. The district court also found that Sheriff Harber had relied on existing law and custom in all of his actions and so declined to award the deputies back pay.

After an appeal had been noted by both parties, the deputies filed a second action against Lee County and its governing body, seeking payment from the County Treasury of back pay. The district court granted summary judgment, holding that the deputies had no claim against the county or its governing body.

In their appeal, the deputies claim they are entitled to an award of back pay, plus punitive damages, against Sheriff Harber, as well as relief against the County of Lee, its Board of Supervisors and members of that Board. The deputies also contend that the district court should have entered a declaratory judgment that section 15.1–48 of the Code of Virginia is unconstitutional.

We disagree with the district court's holding that *Elrod v. Burns, supra,* should be applied retroactively in this case, and reverse that part of the court's decision which reinstated plaintiffs and awarded attorneys fees of $15,000 and taxable costs to them.

1. *Ramey v. Harber*, 431 F.Supp. 657 (W.D.Va. 1977).

I. The Applicability of *Elrod v. Burns*

In his first challenge to the district court's decision, Sheriff Harber makes a fairly persuasive argument that *Elrod v. Burns* has no application in this case on the ground that the facts upon which the Supreme Court based its decision are materially different from those presented here. In *Elrod*, the deputies, who held indefinite terms of appointment, were *discharged* or threatened with discharge solely because "they did not support and were not members of the Democratic Party and had failed to obtain the sponsorship of one of its leaders." The *Elrod* plurality also found that in order to hold their jobs, the deputies were required to "pledge their political allegiance to the Democratic Party, work for the election of other candidates of the Democratic Party, contribute a portion of their wages to the Party or obtain the sponsorship of a member of the Party, usually at the price of one of the first three alternatives." [427 U.S. at 355, 96 S.Ct. at 2681.]

The factual situation before us is dissimilar in several significant respects. Section 15.1–48 of the Code of Virginia (1950 as amended) pursuant to which plaintiffs had been appointed provides as follows:

§ 15.1–48. *Appointment of deputies; their powers; how removed.—*

The treasurer of any county or city, the sheriff of any county or city, any commissioner of the revenue, any county clerk and the clerk of any circuit or city court may at the time he qualifies as provided in § 15.1–38 or thereafter appoint one or more deputies, who may discharge any of the official duties of their principal during his continuance in office, unless it be some duty the performance of which by a deputy is expressly forbidden by law. The officer making any such appointment shall certify the same to the court in the clerk's office of which the oath of the principal of such deputy is filed and a record thereof shall be entered in the order book of such court. Any such deputy at the time his principal qualifies as provided in § 15.1–38 or thereafter, and before entering upon the duties of his office, shall take and prescribe the oath now provided for county officers. The oath shall be filed with the clerk of the court in whose office the oath of his principal is filed and such clerk shall properly label and file all such oaths in his office for preservation. Any such deputy may be removed from office by his principal. Such deputy may also be removed by the court as provided by § 15.1–63.

As the district court found, this statute contains the only authority for the appointment of deputy sheriffs and under its provisions the terms of the deputies in Virginia end with the term of their principal. *Farmers' Bank of Southwest Virginia v. McGavock*, 119 Va. 510, 89 S.E. 949 (1916). In the event Sheriff Harber had wished to retain the plaintiffs as deputies, the district court correctly found that they would have had to requalify and to take and prescribe the appointment oath. All of the plaintiffs were familiar with section 15.1–48 and knew that their appointments terminated with the expiration of Sheriff Flanary's term. They also were aware of the practice which had prevailed for many decades in Lee County and the other small counties under which a change in the political party controlling the sheriff's office is generally followed by a complete change of personnel in the deputy positions. The district court found that such a housecleaning "has long been considered permissible under the applicable Virginia law." Sheriff Harber made no demand on the plaintiffs that they change their political affiliations as a condition to reappointment. Both he and they were well aware of the fact that their jobs ended with Sheriff Flanary's term. Sheriff Harber refused to consider plaintiffs for reappointment, because they had actively opposed his election and because of his reliance on the Virginia statute and upon the practice which his predecessors had followed for a very long time.

In this connection, we take notice of the intimate relationship that undoubtedly exists between the sheriff and his deputies in a small county like Lee County, Virginia.

The efficient operation of the sheriff's office in Lee County requires a high degree of mutual cooperation, confidence and support. None of these elements is likely to be present where the parties are bitter political antagonists. By contrast, the relationship between the sheriff and his deputies in the large Cook County, Illinois office is likely to be far more impersonal. There is no showing that the deputies in *Elrod* took an active part in the campaign against the sheriff. They were discharged because they had generally failed to support the Democratic candidates and the Democratic party. While their lack of party support could create some antipathy between them and the newly elected Democratic sheriff of Cook County, the existence of such antagonism is far from inevitable. However, in this case, the existence of deep antagonism—even animosity—was almost inevitable as a result of the active efforts which plaintiffs made to defeat Sheriff Harber. The record reflects the evidence of this animosity in the friction that arose between plaintiffs and Sheriff Harber when they expressed an interest in the status of their jobs before the sheriff assumed the duties of his office on January 1, 1976.

In *Elrod*, the Supreme Court split into a three-justice plurality, a two-justice concurrence, and a three-justice dissent. The factual distinctions discussed above raise a question as to the applicability of *Elrod* in view of the fact that the concurrence of Justices Stewart and Blackman in the plurality opinion explicitly limited the Court's holding to patronage dismissals.[2] As one commentator has observed, "the narrow position of the concurrence must be taken as the holding of the Court."[3]

The district court's decision is supported by the broad sweep of the *Elrod* plurality, but there is considerable uncertainty as to how a majority of the Supreme Court

would treat a failure to rehire and other patronage practices. Although there is some doubt regarding the application of *Elrod* in this case, it is unnecessary to decide that question in view of our conclusion on the issue of retroactivity. Therefore, for the purposes of disposing of this litigation, we assume without deciding that *Elrod* is applicable.

## II. The Retroactivity Issue

As previously stated, the Supreme Court's decision in *Elrod* was handed down 6 months after Sheriff Harber had assumed the duties of his office and failed to reappoint any of the plaintiffs. In deciding whether this far-reaching decision of the Supreme Court should apply retrospectively in a civil case such as this, we look to the guidelines laid down by the Court in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).

■ First, in order not to be applied retrospectively, the decision must establish "a new principle of law, either by overruling clear past precedent on which litigants may have relied  *  *  *  or by deciding an issue of first impression whose resolution was not clearly foreshadowed  *  *  *." [404 U.S. 106, 92 S.Ct. 355.] In his dissent in *Elrod*, Chief Justice Burger described the holding as follows:

> *  *  *  the Court strains the rational bounds of First Amendment doctrine and runs counter to longstanding practices that are part of the fabric of our democratic system to hold that the Constitution *commands* something it has not been thought to require for 185 years. For all that time our system has wisely left these matters to the States and, on the federal level, to the Congress.  *  *  *  [427 U.S. at 375, 96 S.Ct. at 2690.]

Justice Powell, in his dissent, characterized the majority ruling as follows:

---

**2.** In his concurring opinion, Justice Stewart stated: "The single substantive question involved in this case is whether a nonpolicymaking, nonconfidential government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs. I

agree with the plurality that he cannot." [427 U.S. at 375, 96 S.Ct. at 2690.]

**3.** Note, *Patronage and the First Amendment After Elrod v. Burns*, 78 Columbia L.Rev. 468 (1978).

The Court holds unconstitutional a practice as old as the Republic, a practice which has contributed significantly to the democratization of American politics. This decision is urged on us in the name of First Amendment rights, but in my view the judgment neither is constitutionally required nor serves the interest of a representative democracy. * * * [427 U.S. at 376–77, 96 S.Ct. at 2691.]

These statements, standing alone, are sufficient for us to conclude that *Elrod* decided an issue of first impression whose resolution was not clearly foreshadowed. However, there is much more.

The district court in this case recognized that "*Elrod* did represent a new development of constitutional law in that a state's interest in its patronage system was found to be of insufficient magnitude so as to justify abridgement of First Amendment freedoms." At 669.

Moreover, *Elrod* unquestionably overruled past precedent in this circuit. In *Nunnery v. Barber*, 503 F.2d 1349 (4th Cir. 1974), *cert. denied* 420 U.S. 1005, 95 S.Ct. 1448, 43 L.Ed.2d 763 (1975), this court upheld a patronage discharge against an attack on constitutional grounds. After reviewing the history of judicial consideration of patronage, the court first determined that a patronage discharge case poses an issue which should be resolved legislatively, not judicially, and that the legislative determination should not be overturned unless found to be palpably arbitrary or irrational. Alternatively, the court decided that an employee who voluntarily accepted a position knowing that it was dependent upon political activity waived the right to complain of a patronage discharge.

Finally, the court rejected the contention that the plaintiff's case was supported by previous decisions of the Supreme Court, stating:

4. Plaintiffs correctly point out that this court distinguished *Nunnery* from *Illinois State Employees Union v. Lewis*, 473 F.2d 561 (7th Cir. 1972), on the ground that the legislative characterization of Nunnery's job as sensitive and nonroutine was not arbitrary and irrational. However, *Nunnery* emphatically held that the

Nor do we find any support for plaintiff's contention in *Perry v. Sindermann* (1972), 408 U.S. 593, 93 [92] S.Ct. 2694, 33 L.Ed.2d 570, even though she places great reliance on that authority. That case involved a college teacher, who had not been employed as a patronage employee and whose initial or continued employment was in no way dependent on political affiliation or activity. * * * [503 F.2d 1359.] [4]

Understandably, the deputies argue that *Elrod* was clearly foreshadowed by *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 750 (1972). Assuming *arguendo* that we could agree with this contention, we would still hold that *Elrod* should not be applied retroactively in this case, because "it was a clear break with the past." *Desist v. United States*, 394 U.S. 244, 248, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); *cf. CSC v. Letter Carriers*, 413 U.S. 548, 564, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *United Public Workers v. Mitchell*, 330 U.S. 75, 99, 67 S.Ct. 556, 91 L.Ed. 754 (1947).[5]

■ The second criterion set forth in *Chevron* requires a court to "weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." [404 U.S. 106–07, 92 S.Ct. 355, quoting *Linkletter v. Walker*, 381 U.S. 618, 629, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).] We find this the most difficult of the factors to apply, because we are not persuaded that a showing has been made that retroactive application of *Elrod* in this case will further or retard the operation of the new rule. In civil cases, which present different considerations from those in criminal cases,

*Lewis* decision was unprecedented and contrary to the general rule followed by both state and federal courts.

5. See the discussion of these cases in *Elrod v. Burns*, 427 U.S. 347, 386–87, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (Powell, J., dissenting).

the courts have often focused on such factors as reliance and the need for stability.[6] We think this is the teaching of *Lemon v. Kurtzman*, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973), the most recent expression of the Supreme Court on the question.

We are faced then with a situation where we must use the balancing process to determine whether the benefits to be gained by applying *Elrod* retroactively to this case are outweighed by considerations of reliance, hardship, injustice, and the impact on the administration of justice in the Fourth Circuit.

The district court found that Sheriff Harber undoubtedly acted under color of state law, relied on the applicable Virginia statute, and followed the longstanding practice under which newly elected sheriffs in Lee and other Virginia counties selected their deputies on a patronage basis. The court also recognized that Sheriff Harber's action was in accord with the applicable law in the Fourth Circuit as expressed in *Nunnery v. Barber, supra*. Nevertheless, the district court concluded that none of the classic elements of reliance interest are present in this case.

First, with respect to the sheriff's reliance on *Nunnery v. Barber*, the district court held that the conflict between that case and *Illinois State Employees Union v. Lewis, supra*, was sufficient to diminish the "potential for a reliance interest." We cannot agree.

In *Nunnery v. Barber, supra*, this court found that *Illinois State Employees Union* was "without direct precedent" and a departure from the accepted rule which had been laid down in many cases cited in the opinion. [503 F.2d 1352, and n.6.] As this court also noted, several commentators had remarked that *Illinois State Employees Union* was the first case which granted constitutional protection of political association to patronage employees. *Id.* Under these circumstances, the sheriff's reliance on the *Nunnery* case was reasonable.

The district court also concluded that the defendant's reliance was unjustified because (1) he did not act in reliance upon a decision of the Supreme Court; (2) *Elrod* did not overrule an existing Supreme Court precedent, and (3) in view of the Supreme Court's holdings in *Perry v. Sindermann, supra*, and *Keyishian v. Board of Regents, supra*, Sheriff Harber should reasonably have suspected that he could not act with impunity. We have already pointed out that in *Nunnery*, we expressly considered *Perry v. Sindermann* and decided it did not support the plaintiff's position, because it involved a teacher who had not been employed on a patronage basis and whose continued employment was not dependent upon political affiliation or activity.

If this court could not foresee the decision in *Elrod*, we certainly cannot agree that Sheriff Harber should have anticipated that his actions would be condemned by this new development in constitutional law.

The district court also dismissed defendant's reliance on the Virginia statute and upon the long-existing patronage practice on the grounds (1) that the statute is relatively innocuous, authorizing no more than an exercise of discretion, and (2) that opportunities for the exercise of political patronage have been largely whittled away by the growth of civil service systems. We think a sufficient reason for rejecting this view may be found in the following statement from *Lemon v. Kurtzman, supra*, at 199:

> * * * statutory or even judge-made rules of law are hard facts on which people must rely in making decisions and in shaping their conduct. This fact of legal life underpins our modern decisions recognizing a doctrine of nonretroactivity. * * *

The final element for determining retroactivity, as stated in *Chevron*, calls for weighing the inequity that may be imposed as a result of retroapplication, for, as the Court said, "[w]here a decision of this Court

**6.** Note, *Retroactivity and Civil Suits: Linkletter Modified*, 42 Fordham L.Rev. 653, 659 (1974). *See also* Currier, *Time and Change in Judge-Made Law: Prospective Overruling*, 41 Virginia L.Rev. 201, 235–37 (1965).

could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." [404 U.S. at 106–07, 92 S.Ct. at 355, quoting *Cipriano v. City of Houma*, 395 U.S. 701, 706, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969).] We are convinced that both hardship and disruptive instability will result from the retrospective application of *Elrod*. Although we do not have any statistics showing the number of employees who would be affected, we may safely assume that there are thousands of patronage appointments in Virginia and in this circuit which will be subject to attack if *Elrod* is given retroactive application. If former employees whose jobs expired under the terms of state law are reinstated, new employees who were hired in reliance on existing law and custom followed for many years will lose their jobs. Several cases are now pending in the district court below,[7] brought by plaintiffs who seek recovery on the ground that they lost their positions through the operation of the patronage system which existed before *Elrod* was decided. A large turnover of employees in state and county offices would undoubtedly create confusion and seriously disrupt the efficient functioning of these offices. Such expectations and probabilities prompted the court in *Litwhiler v. Hidlay*, 429 F.Supp. 984 (M.D.Pa.1977), to hold that *Elrod* should not be applied retrospectively. The court there reviewed the factors discussed in *Chevron* and based its holding primarily on the chaos which the court felt would result from a retroactive application, declaring that such action "would ignite a chain reaction of claims whose magnitude exceeds reasonable assessment." [429 F.Supp. at 987] Except for the decision of the district court below, *Litwhiler* is the only case we

have found in which a court has expressly considered and ruled on the retroactivity of *Elrod*.[8]

Finally, we think the hardship that may be imposed upon many employees who would lose their jobs by the retroactive application of *Elrod* is substantially greater than the hardship that will be suffered by plaintiffs if we decide that *Elrod* should be applied prospectively only. The hardship caused them by this decision is no greater than that sustained by the deputies they replaced in January 1972. Plaintiffs were well aware of the state law and the patronage practice that had long prevailed and realized when they were appointed by Sheriff Flanary that they could expect to lose their jobs if he lost the election. We agree with defendant that their reinstatement was a windfall—a result which we think should not be provided by a holding of retroactivity.

We think the factors which we have discussed tilt the balance in favor of the prospective application of *Elrod*. It follows that the portion of the district court's judgment and order of April 1, 1977, which ordered plaintiffs' reinstatement and awarded attorneys' fees and costs is hereby set aside. Sheriff Harber may, at his discretion, replace any of the plaintiffs who were reinstated by the district court's order, provided that written notice of the proposed action shall be given to each of the affected deputies at least 30 days before the effective date of his termination.

AFFIRMED IN PART AND REVERSED IN PART.

K. K. HALL, Circuit Judge, concurring:

I concur in the result reached by the majority, but I think that we cannot fairly decide the issue of *Elrod's* retroactivity

---

7. The number of these cases may be quite large, so the plaintiffs' observation that the statute of limitations has now run for pre-*Elrod* dismissals is unpersuasive.

8. Claiming that *Litwhiler* is of doubtful validity, plaintiffs rely on *Rosenthal v. Rizzo*, 555 F.2d 390 (3d Cir. 1977); *Alfaro de Quevedo v. De Jesus Shuck*, 556 F.2d 591 (1st Cir. 1977); *Rivera Morales v. Benitez de Rexach*, 541 F.2d 882 (1st Cir. 1976), and *Barton v. City of Eustis*, 415 F.Supp. 1355 (M.D.Fla.1976). An examination of these cases reveals that the issue of retroactivity was not discussed and apparently was never raised in any of them. Consequently, we cannot consider them as authoritative precedents on the retroactivity issue.

without first determining that the issue is squarely presented by the facts. If this case is not controlled by the rule of *Elrod* —and I submit that it is not, as the majority itself intimates—then we have no occasion to consider whether *Elrod* should be accorded retroactive effect.

Because I fear that the majority opinion may be read to imply that *Elrod* would apply prospectively on facts similar to those in this case, I write to express my view that *Elrod* has no application here. The majority discusses a number of pertinent factual considerations: (1) the deputies took office pursuant to a statute which fixed their terms and were simply not rehired after the terms expired; (2) the deputies actively campaigned against Sheriff Harber (which refutes any inference that they lost their jobs because of passive political beliefs or affiliation); (3) the deputies were not pressured to contribute time or money to Harber's party or to obtain the sponsorship of a member of that party; and (4) the nature and size of the Lee County Sheriff's Office necessitates mutual confidence and co-operation, which is unlikely to exist where members of the office have actively opposed each other in a bitter election campaign. These facts are completely dissimilar to those in *Elrod*, and mandate the conclusion that Sheriff Harber was not constitutionally constrained to re-hire the deputies whose terms had expired.

I would deny relief on this ground, and save the issue of *Elrod's* retroactivity for another day.