657 F.2d 1363
 Nicholas D. MARINO, Appellant,
v.
G. Roger BOWERS, George M. Metzger and John Welsh,
Individually and Officially as members of the Board of
Commissioners of Bucks County and Joseph F. Catania,
Individually and The Board of Commissioners of Bucks County
and County of Bucks, Pennsylvania, Appellees.
 No. 80-1395.
 United States Court of Appeals,
Third Circuit.
 Submitted on Briefs Under Third Circuit Rule 12(6) Sept. 19, 1980.
Reheard In Banc May 11, 1981.
Decided Sept. 8, 1981.
As Amended Sept. 11, 1981.
 
 Norman C. Henss, (Argued), Thomas N. Abbonizio, Philips, Curtin & DiGiacomo, Philadelphia, Pa., for appellant.
 James M. Penny, Jr., (Argued), Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., Robert L. White, County Sol., Doylestown, Pa., for appellees.
 Submitted Under Third Circuit Rule 12(6) Sept. 19, 1980.
 Before GIBBONS, WEIS and SLOVITER, Circuit Judges.
 Argued In Banc May 11, 1981.
 Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 I.
 
 1
 The issue on appeal in this case is whether the Supreme Court's decision in Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), should be applied retroactively. The district court held that it should not, and dismissed appellant's complaint. We find that the court correctly applied the retroactivity factors enumerated in Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), and affirm.
 
 II.
 A.
 
 2
 Appellant Nicholas D. Marino was hired by the Board of Commissioners of Bucks County, Pennsylvania (hereafter Board) in February 1973 as the maintenance manager of parks and recreation of Bucks County, a nonconfidential, non-civil service position. At that time, the three-member Board had a Democratic majority. Marino at all times relevant to this litigation was a registered Democrat. As a result of the November 1975 election in Bucks County, the composition of the Board changed to a Republican majority. On January 3, 1976, the new Board took office. On February 10, 1976, Marino was discharged.
 
 
 3
 Marino's complaint alleges that he had at all times performed his duties in a good and satisfactory manner, and that he was discharged "solely by reason of his political party affiliation and because he neither supported nor was a member of the newly elected majority political party and was unable to obtain the sponsorship of the leaders of that party." Because this case reaches us on a motion to dismiss, we must accept these allegations as true. Marino's complaint asserted claims under the First and Fourteenth Amendments of the United States Constitution, as well as under 42 U.S.C. §§ 1983, 1985, 1986 and 1988. Named as defendants were the Board of Commissioners of Bucks County, the County, the current commissioners in their official and individual capacities, and a former commissioner in his individual capacity.[1] Marino requested injunctive and declaratory relief, reinstatement with backpay, and punitive damages.
 
 B.
 
 4
 On June 28, 1976, four months after Marino's discharge, the Supreme Court held that the patronage dismissal of a nonpolicymaking, nonconfidential governmental employee violated the employee's rights to freedom of belief and association guaranteed by the First Amendment. Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Three years later, Marino filed his complaint which in substance is based on the Elrod decision. Defendants moved to dismiss the complaint for failure to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). Defendants claimed that the Elrod decision should not be given retroactive effect and that none of the various civil rights statutes pleaded could support the action. In ruling on the motion, the district court looked to the factors set forth in Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), as guiding a decision on retroactivity, and concluded that Elrod should not be given retroactive effect. Marino v. Bowers, 483 F.Supp. 765 (E.D.Pa.1980). Marino's other constitutional and statutory claims were also dismissed. Marino raises on appeal only the holdings that Elrod should not be applied retroactively and that he failed to allege a claim cognizable under 42 U.S.C. § 1985(3).[2]
 
 III.
 
 5
 It has long been recognized in criminal as well as civil cases that certain judicial rulings or interpretations should operate only prospectively. See, e. g., Gelpcke v. City of Dubuque, 68 U.S. (1 Wall.) 175, 17 L.Ed. 520 (1864); Havemeyer v. Iowa County, 70 U.S. (3 Wall.) 294, 18 L.Ed. 38 (1866); Chicot County Drainage District v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). The Supreme Court has held that even when the new ruling involves an interpretation of the Constitution, it will not necessarily be given retroactive effect, thereby weakening the force of the Blackstonian theory that judges do not make but merely "discover" law. Linkletter v. Walker, 381 U.S. at 622-29, 85 S.Ct. at 1733-37.
 
 
 6
 The factors to be considered in deciding whether a ruling is to be limited to prospective application were summarized in the Chevron case. First we must consider whether the decision overruled "clear past precedent on which litigants may have relied" or whether the issue was one "of first impression whose resolution was not clearly foreshadowed." Chevron Oil Co. v. Huson, 404 U.S. at 106, 92 S.Ct. at 355. Second, we must look to the prior history of the rule in question, its purpose and its effect to ascertain "whether retrospective operation will further or retard its operation." Id. at 107, 92 S.Ct. at 355. Finally, we must weigh "the inequity imposed by retroactive application." Id.
 
 
 7
 Marino contends that we should not undertake this analysis because a ruling dealing with fundamental personal rights should never be limited to prospective application. However, review of cases holding that constitutional rulings and interpretations should not be applied retroactively demonstrates that the analysis discussed in Chevron and the earlier Linkletter and Stovall decisions has been used in a wide variety of instances. To cite just a few examples, in Linkletter the Court held that the holding of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 111, 5 L.Ed.2d 90 (1961), that the exclusionary rule of the Fourth Amendment applied to the states through the due process clause of the Fourteenth Amendment, would not be applied retroactively. Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). Similarly, in Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), the Court declined to give retroactive application to the rulings of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which restricted the use of statements made by defendants while in police custody. These cases, although dealing with constitutional rules of criminal procedure, nonetheless implicated fundamental personal rights. Retroactive application of decisions has been denied even where the rulings involved such fundamental rights as the provision for a jury trial in serious criminal cases, DeStefano v. Woods, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968) (per curiam); the right to have criminal jury panels from which women were not systematically excluded, Daniel v. Louisiana, 420 U.S. 31, 95 S.Ct. 704, 42 L.Ed.2d 790 (1975) (per curiam); the right to vote in revenue bond elections, Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969) (per curiam); and freedom from "excessive entanglement" of church and state by a scheme of public funding of nonpublic sectarian schools, Lemon v. Kurtzman, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973). This court has limited to prospective application such significant rulings as lack of federal jurisdiction where diversity is "manufactured," McSparran v. Weist, 402 F.2d 867 (3d Cir. 1968) (en banc), cert. denied, 395 U.S. 903, 89 S.Ct. 1739, 23 L.Ed.2d 217 (1969); lack of adjudicatory power of improperly convened special court-martial tribunals, Brown v. United States, 508 F.2d 618 (3d Cir.), cert. denied, 422 U.S. 1027, 95 S.Ct. 2621, 45 L.Ed.2d 684 (1975); and the unconstitutionality of ex parte replevin procedures, Kacher v. Pittsburgh National Bank, 545 F.2d 842 (3d Cir. 1976). See also G. H. McShane Co. v. McFadden, 554 F.2d 111 (3d Cir.), cert. denied, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977). In each case we considered whether retroactive application was warranted under the analysis suggested in Chevron or its predecessors. We turn then to that analysis.
 
 A.
 
 8
 Did Elrod v. Burns Establish a New Rule of Law?
 
 
 9
 In Hanover Shoe, Inc. v. United Shoe Machinery Corp., 377 F.2d 776 (3d Cir. 1967), aff'd in part, rev'd in part, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), antitrust plaintiffs who had proven defendant had monopoly power but had not shown that it had actually engaged in predatory practices sought damages for defendant's monopolization for the entire period covered by the statute of limitations. This court held that the plaintiffs could only collect damages from the date of the Supreme Court's opinion in American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), which we read as establishing a new rule that proof of predatory practices was not essential to a successful claim under section 2 of the Sherman Act. 377 F.2d at 787-90. We reasoned that the defendants had relied on clear and established doctrine and that the new rule of American Tobacco should only be applied prospectively.
 
 
 10
 On appeal, the Supreme Court did not pass upon our theory of prospective application because it determined that the rule announced in American Tobacco was not a new one. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). The Court, noting that American Tobacco relied on existing authorities, found no "abrupt and fundamental shift in doctrine as to constitute an entirely new rule which in effect replaced an older one." Id. at 497, 88 S.Ct. at 2233. It concluded that it "(could) not say that prior to those cases potential antitrust defendants would have been justified in thinking that then current antitrust doctrines permitted them to do all acts conducive to the creation or maintenance of a monopoly so long as they avoided direct exclusion of competitors or other predatory acts." Id. at 499, 88 S.Ct. at 2234.
 
 
 11
 Thus, in determining whether the rule of law in question fits within the first Chevron factor, a court must look both to the state of the law at the time of the ruling and the reasonable perceptions of those persons who claim to have relied on it. Marino argues that Elrod had a firm foundation in previous decisions of the Supreme Court, particularly West Virginia Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), and therefore was "clearly foreshadowed." In Barnette, the Court held unconstitutional a Board of Education resolution requiring all teachers and pupils in public schools to salute the flag. In Perry, the Court held that a state university professor could not be discharged for exercising his constitutional right to criticize his superiors on matters of public concern. While these cases reaffirmed the broad diapason of the First Amendment, we do not believe that either case was a harbinger of the destruction of the patronage system effected by Elrod. The fact that Perry and other First Amendment cases were subsequently relied upon by the Elrod majority does not signify that Elrod was clearly foreshadowed.
 
 
 12
 On the contrary, there was a substantial line of federal cases which had rejected constitutional challenges to the dismissal of "at will" employees for patronage purposes. Nunnery v. Barber, 503 F.2d 1349 (4th Cir. 1974), cert. denied, 420 U.S. 1005, 95 S.Ct. 1448, 43 L.Ed.2d 763 (1975); Alomar v. Dwyer, 447 F.2d 482 (2d Cir. 1971) (per curiam), cert. denied, 404 U.S. 1020, 92 S.Ct. 683, 30 L.Ed.2d 667 (1972). See also Young v. Coder, 346 F.Supp. 165 (M.D.Pa.1972); Norton v. Blaylock, 285 F.Supp. 659 (D.Ark.1968), aff'd, 409 F.2d 772 (8th Cir. 1969). In Nunnery v. Barber, supra, the court held that dismissal of a state liquor store manager did not violate either the First or Fourteenth Amendment, and distinguished Perry v. Sindermann on the ground that it did not involve a patronage employee. That court failed to see the inevitable connection between Perry and patronage dismissals which Marino contends should have been apparent to Bucks County officials. In Alomar v. Dwyer, the Court of Appeals for the Second Circuit rejected the claim of a government employee that her discharge based on her refusal to change her political allegiance to the incumbent party violated her rights of free speech and assembly. 447 F.2d at 483. The court held that the "plain hard fact is that so far as the Constitution is concerned there is no prohibition against the dismissal of Government employees because of their political ... affiliations." Id., quoting Bailey v. Richardson, 182 F.2d 46, 59 (D.C.Cir.), aff'd per curiam by an equally divided court, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352 (1950). In Young v. Coder, 346 F.Supp. at 169, the court, although declining to reach the constitutionality of the "spoils system", concluded that the spoils system "has to date been considered a valid exercise of discretionary authority." Similarly, in Norton v. Blaylock, the court commented, "Aside from considerations of race, religion or constitutionally protected conduct, none of which appear to be involved here, a public employee still assumes the risk, as far as the Constitution is concerned of being discharged for personal or political reasons." 285 F.Supp. at 662.
 
 
 13
 More importantly, there was a clear holding of the Pennsylvania Supreme Court that affirmed the legality of such patronage firings. In 1971, Pennsylvania transportation workers sought to challenge the dismissals they anticipated under a forthcoming change of administration. AFSCME v. Shapp, 443 Pa. 527, 280 A.2d 375 (1971).[3] Plaintiffs contended that they "should be entitled to notice and a hearing before discharge, and that political affiliation is not a proper or lawful basis or ground for discharge." Id. at 536, 280 A.2d at 376 (emphasis added). The Pennsylvania Supreme Court held that plaintiffs had not established a constitutional right to retain their jobs, notwithstanding their allegations that they were being fired solely on the grounds of political sponsorship or affiliation. Id. at 377-78. See also Scott v. Philadelphia Parking Authority, 402 Pa. 151, 166 A.2d 278 (1960); Mahoney v. Philadelphia Housing Authority, 13 Pa.Cmwlth. 243, 320 A.2d 459 (1974), cert. denied, 419 U.S. 1122, 95 S.Ct. 806, 42 L.Ed.2d 822 (1975).
 
 
 14
 Using hindsight, it is possible to reconstruct a foreshadowing of the Elrod holding in the Seventh Circuit's decisions in Illinois State Employees Union v. Lewis, 473 F.2d 561 (7th Cir. 1972), cert. denied, 410 U.S. 928, 943, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973) (holding political discharges were unconstitutional) and Burns v. Elrod, 509 F.2d 1133 (7th Cir. 1975) (holding a claim for patronage dismissal was legally cognizable)[4], as well as in the strong dissents to the Fourth Circuit's decision in Nunnery v. Barber, 503 F.2d at 1360-62 (Butzner, J., dissenting), and the Pennsylvania Supreme Court's decision in AFSCME v. Shapp, 443 Pa. at 537-45, 280 A.2d at 379-83 (Barbieri, J., dissenting). Whatever the effect of the Seventh Circuit opinions on the officials of states within its jurisdiction, it is unreasonable to expect that county and municipal officials in Pennsylvania should have anticipated the ultimate holding which they presaged. The Pennsylvania Supreme Court decision, which local governments in Pennsylvania must undertake to follow, was a 4 to 3 decision that upheld the political patronage system. Local government officials were undoubtedly aware of the significance of the result, i. e., that a challenge to the patronage system had been mounted and had failed. The dissent, albeit prescient, was nonetheless just that a dissent. As the court stated in Raggio v. Matunis, 489 F.Supp. 16, 18 (E.D.Pa.1979), "Every decision of the Supreme Court is foreshadowed to some extent by the fact that an issue is sufficiently unsettled to be litigated to the point of review before the Court. Obviously, this is not sufficient to deem the decision retroactive, or there would be no retroactivity doctrine." The existence of a clear, strongly-worded dissent tends to highlight the majority's rejection of that approach. Were we to require individuals to be guided in their actions by dissenting opinions we would stand the system of stare decisis on its head.
 
 
 15
 It would not be in denigration of the Elrod decision to take note that the practice which it proscribed, political patronage, had been part of our national life from the early days of the republic. The well-publicized employee turnovers under the Jefferson and Jackson eras reflected a way of life which attracted past adherents and present advocates. See Loughney v. Hickey, 635 F.2d 1063, 1065 (3d Cir. 1980) (Aldisert, J., concurring). The Justices who dissented from the Elrod decision vehemently referred to the substantial change which it wrought. See Elrod, 427 U.S. at 375, 96 S.Ct. at 2690 (Burger, C.J., dissenting) ("The Court strains the rational bounds of First Amendment doctrine and runs counter to longstanding practices that are part of the fabric of our democratic system to hold that the Constitution commands something it has not been thought to require for 185 years") (emphasis in original); id. at 376, 96 S.Ct. at 2691 (Powell, J., dissenting) ("The Court holds unconstitutional a practice as old as the Republic, a practice which has contributed significantly to the democratization of American politics"). Commentators were also divided on the issue of the constitutionality of political firings at the time of the Elrod decision. See Note, A Constitutional Analysis of the Spoils System The Judiciary Visits Patronage Place, 57 Iowa L.Rev. 1320 (1972); Comment, Patronage Dismissals: Constitutional Limits and Political Justifications, 41 U.Chi.L.Rev. 297 (1974); Note, The Spoils System: Ripe for Justiciability ?, 34 U.Pitt.L.Rev. 699 (1973); Note, Political Patronage and Unconstitutional Conditions: A Last Hurrah for the Party Faithful ?, 14 Wm. & Mary L.Rev. 720 (1973). It is not reasonable to expect our local politicians to be gifted with clairvoyance. Viewing the state of the law both objectively and from the reasonable perspective of the defendants, we believe that Elrod v. Burns represented a fundamental shift from prior practice and legal doctrine.
 
 B.
 
 16
 Will Retrospective Operation Further or Retard the Ruling in Elrod v. Burns ?
 
 
 17
 In analyzing the second Chevron factor, which the district court characterized as "whether retroactivity is necessary to accomplish the purpose of the Elrod decision," it concluded that retroactive application was not necessary to insure future adherence to the Elrod rule. 483 F.Supp. at 767. We agree with those courts which have considered the retroactivity of Elrod and have found this factor difficult to apply. See, e. g., Aufiero v. Clarke, 639 F.2d 49, 51 (1st Cir. 1981); Ramey v. Harber, 589 F.2d 753, 758 (4th Cir. 1978), cert. denied, 442 U.S. 910, 99 S.Ct. 2823, 61 L.Ed.2d 275 (1979); Litwhiler v. Hidlay, 429 F.Supp. 984, 986 (M.D.Pa.1977). There has been no showing either that retroactive application of Elrod will further operation of its rule, or that limiting it only to future cases will retard its operation. In its discussion of this factor in civil cases, the Fourth Circuit in Ramey v. Harber, 589 F.2d at 758-59, referred to reliance and the need for stability, matters which appear to verge on the other Chevron factors. We focus, as did the district court, on the underlying ruling in question and we see no reason why the prospective application of Elrod would not be sufficient to vindicate the constitutional principle it enunciated.
 
 C.
 
 18
 Would Retroactive Application of Elrod v. Burns Be Inequitable ?
 
 
 19
 Consideration of the final Chevron factor "the inequity imposed by retroactive application", 404 U.S. at 107, 92 S.Ct. at 355, points most persuasively towards prospective application only. In its decision, the district court determined that retroactive application would "effectively penalize those who relied upon prior law." 483 F.Supp. at 768. The court noted that reinstatement of appellant would entail either dismissing his successor or overloading the payroll with more than one maintenance manager of parks and recreation.
 
 
 20
 We agree with the district court that the equities weigh in favor of defendants. It is not only that political patronage, with the attendant political dismissals, was a way of life. Nor is it only that there are thousands of local government units in Pennsylvania[5] which, in these times of increased government responsibilities and inadequate government funds, may be sorely pressed to pay damages to persons fired before the Elrod decision. It is, in this case at least, as the district court noted, that Marino himself was a patronage employee. 483 F.Supp. at 768. He was hired in 1973 by a Democratic administration and was discharged when the Republicans attained a majority.
 
 
 21
 Marino's complaint alleges the discharge was pursuant to "the custom and practice and official policy of defendants County of Bucks and the Board of Commissioners" to discharge non-civil service employees who were affiliated with the recently defeated political party. Although we need not embrace the sentiment referred to by the district judge that "(t)hose who, figuratively speaking, live by the political sword must be prepared to die by the political sword," id., quoting AFSCME v. Shapp, 443 Pa. at 536, 280 A.2d at 378, a significant factor in considering the equities is a claimant's reasonable expectation. Having apparently acquired his employment under that same system he now attacks, Marino could not have expected that he would be retained once the political climate changed. The expectation today, of course, would be otherwise. But by his own complaint allegations, Marino knew his hold on that position would be tenuous after a change in administrations. Therefore, there is little equity to support his argument for retroactive application of Elrod.
 
 
 22
 Marino relies heavily on the statement in Owen v. City of Independence, Missouri, 445 U.S. 622, 655, 100 S.Ct. 1398, 1418, 63 L.Ed.2d 673 (1980), where the Court said: "(E)ven where some constitutional development could not have been foreseen by municipal officials, it is fairer to allocate any resulting financial loss to the inevitable costs of government borne by all the taxpayers, than to allow its impact to be felt solely by those whose rights, albeit newly recognized, have been violated." The issue before the Court in Owen was whether the municipality was entitled to the same qualified immunity defense which individual defendants may assert. In holding the municipality was not entitled to good faith immunity, the Court held that the rationales for the doctrine of official immunity, i. e., to avoid monetary injustice to individual officers and inhibit their official actions, were inapplicable to municipal defendants. The distinction made in Owen between municipal and individual defendants cannot logically be applied in deciding whether a constitutional ruling should be applied retroactively. Nothing in the Owen case indicates that the doctrine of qualified immunity was intended to supplant the Chevron analysis. However, if the sentence in Owen on which Marino relies were given the interpretation he suggests, it would foreclose consideration of the third Chevron factor, because the balance would always be weighted against the municipality. Where, as here, the application of all the Chevron factors points to nonretroactivity, we are unwilling to hold to the contrary based on one sentence of a Supreme Court opinion in a different context.
 
 D.
 
 23
 Based on our review of the foregoing factors, we conclude that the Supreme Court's decision in Elrod should not be applied retroactively. We note that this result is consistent with the holdings of all of the federal courts to have considered the issue.[6] See Aufiero v. Clarke, supra; Ramey v. Harber, supra; Raggio v. Matunis, 489 F.Supp. 16 (E.D.Pa.1979); Litwhiler v. Hidlay, supra.[7]III.
 
 
 24
 Marino also asserts a claim under 42 U.S.C. § 1985(3) (1976),[8] which he contends was wrongfully dismissed by the district court. That court had concluded that "discrimination against the members of a rival political party in connection with patronage practices is not the kind of invidious discrimination prohibited by § 1985." 483 F.Supp. at 769. As the Supreme Court said in Great American Federal Savings & Loan Ass'n v. Novotny, 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979), "Section (1985(3)) provides no substantive right itself; it merely provides a remedy for violation of the rights it designates." Since we have determined that Marino cannot rely on retroactive application of Elrod v. Burns as the source of his asserted constitutional rights, we need not consider whether the district court correctly construed section 1985(3).
 
 
 25
 For the foregoing reasons, we will affirm the judgment of the district court.
 
 
 26
 WEIS, Circuit Judge, with whom GIBBONS, Circuit Judge, joins, dissenting.
 
 
 27
 It has long been a tenet of the common law that a court does not pronounce new law, but expounds the law of the case as it existed when the controversy arose. Although it antedates Blackstone's era, this view is expressed in his commentaries and is generally referred to as the Blackstonian Theory.[1] Its essence is that since law is merely "discovered" in the disposition of a case, it follows logically that the decision, as a declaration of what the law had always been, is given retroactive effect. In this respect, a judicial decision contrasts sharply with the action of a legislature whose statutes are prospective in nature. The difference in approach may be explained in part by the fact that the courts are called upon to resolve disputes after they have arisen. In deciding for one party or the other, the decision, of necessity, operates retroactively.
 
 
 28
 The Blackstonian Theory, however, has been modified, to some extent, by the influence of John Austin. He contended that courts indeed make law and do not simply interpret the old, and this argument did not escape the United States Supreme Court. In discussing the effect of a declaration of a statute's unconstitutionality, Chief Justice Hughes remarked in Chicot County Drainage District v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940), that a determination of unconstitutionality "may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration .... (A)n all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified." Id. at 374, 60 S.Ct. at 318 (footnotes omitted).
 
 
 29
 By 1965, the Court had come to the view "that in appropriate cases the Court may in the interest of justice make the rule prospective." Linkletter v. Walker, 381 U.S. 618, 628, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965). In Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the Court listed three conditions that were to be met, particularly in civil cases, if only prospective application was to be appropriate. The opinion nonetheless confirms that retroactivity is the rule, not the exception.
 
 
 30
 There are sound philosophical reasons for generally observing the rule of retroactivity. It is important that courts have the confidence of the public in the disposition of disputes submitted to them. That support is in part based upon the belief that judges are bound by law, which is applied impersonally and impartially. Especially is this so with respect to constitutional adjudications which are not subject to revision by democratic legislative processes. Sir John Salmond expressed the sentiment well, "In the application of and enforcement of a fixed and predetermined rule, alike for all and not made for or regarding his own case alone, a man will willingly acquiesce. But to the 'ipse dixit' of a court, however just or impartial, men are not so constituted as to afford the same ready obedience and respect." Quoted in Cooperrider, The Rule Of Law And The Judicial Process, 59 Mich.L.Rev. 501, 505 (1961).
 
 
 31
 In addition, retroactivity has a tendency to act as a restraint on judicial legislating. When a court is required to ponder the effects of a decision departing from previous pronouncements upon those who have justifiably relied upon earlier rulings, its judgment may be better informed and confined to proper judicial boundaries. See James v. United States, 366 U.S. 213, 225, 81 S.Ct. 1052, 1058, 6 L.Ed.2d 246 (1961) (Black, J., dissenting); Mishkin, The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv.L.Rev. 56, 70 (1965).
 
 
 32
 Although these considerations do not bar prospective rulings in appropriate cases, they do counsel against a too facile interpretation of the Chevron guidelines.
 
 I.
 
 33
 The application of the first Chevron factor whether Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), established a new principle of law requires an analysis of the law as it existed when the plaintiff was discharged and whether it justified the defendant's action. As the majority recognizes, this element is satisfied either by showing that Elrod overruled clear past precedent on which the litigants may have relied, or by establishing that the case decided an issue of first impression whose resolution was not clearly foreshadowed.
 
 
 34
 These two elements should not be confused. Either is sufficient to meet the test, and in the interest of clarity, they should be separately considered. Furthermore, it must be recognized that the first factor presents a threshold inquiry. The Chevron Court said "the decision to be applied nonretroactively must establish a new principle of law." 404 U.S. at 106, 92 S.Ct. at 355. And, as the author of the Chevron opinion explained only six months later, "An issue of the 'retroactivity' of a decision of this Court is not even presented unless the decision in question marks a sharp break in the web of the law." Milton v. Wainwright, 407 U.S. 371, 381 n.2, 92 S.Ct. 2174, 2179 n.2, 33 L.Ed.2d 1 (1972) (Stewart, J., dissenting; the majority did not reach this issue); see Kremer v. Chemical Construction Corp., 623 F.2d 786, 789 (2d Cir. 1980).
 
 A.
 
 35
 The first of the alternate questions, then, is whether Elrod overruled clear past precedent on which the litigants may have relied. Since there was no controlling decision of the United States Supreme Court or this court, the majority relies primarily on AFSCME v. Shapp, 443 Pa. 527, 280 A.2d 375 (1971), and to a lesser extent on Nunnery v. Barber, 503 F.2d 1349 (4th Cir. 1974), cert. denied, 420 U.S. 1005, 95 S.Ct. 1448, 43 L.Ed.2d 763 (1975), and Alomar v. Dwyer, 447 F.2d 482 (2d Cir. 1971) (per curiam), cert. denied, 404 U.S. 1020, 92 S.Ct. 683, 30 L.Ed.2d 667 (1972), as well as several district court cases.
 
 
 36
 It may be tempting to assume that because the Supreme Court did not overrule any of its cases in resolving Elrod, this aspect of the first Chevron criterion has not been met. However, in United States v. Peltier, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975), the Court expressly held "that parties may ... reasonably rely upon ... legal pronouncement(s) emanating from sources other than this Court." Id. at 542, 95 S.Ct. at 2320. There, the issue was whether the Court's decision in Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), invalidating border searches conducted without probable cause, should be applied in nonretroactive fashion. The Court held that it could because "uniform treatment of roving border patrol searches by the federal judiciary was overturned by this Court's decision in Almeida-Sanchez." 422 U.S. at 542, 93 S.Ct. at 2320. Likewise, in Chevron the Court found the test satisfied because the law-changing decision at issue there, Rodrigue v. Aetna Casualty & Surety Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), "effectively overruled a long line of decisions by the Court of Appeals for the Fifth Circuit holding that admiralty law, including the doctrine of laches, applies through the Lands Act." 404 U.S. at 107,[2] 92 S.Ct. at 355.
 
 
 37
 In this circuit there was no binding precedent on this issue of federal constitutional law. The majority asserts that AFSCME v. Shapp, a decision of the Pennsylvania Supreme Court, is particularly significant because local governments in the state were required to follow it. It must be remembered, however, that it is a federal constitutional right at issue here, and in that field no federal court is bound by a decision of a state supreme court, despite our deference to its rulings in matters of state law. Municipalities in Pennsylvania had to be aware of that basic premise, as well as the fact that this court had not decided the constitutional issue. The AFSCME case, therefore, did not entitle the defendants to assume that the issue had been foreclosed in federal forums.
 
 
 38
 Moreover, the AFSCME majority did not present a persuasive case. Indeed, the opinion of the court represented the views of only two judges, two others simply concurring without opinion. The AFSCME court's opinion cited only one federal case, Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), and relied on it for the proposition that government employment could be revoked at the will of the appointing officer. In that case, however, the plaintiff was not employed by the government, but by a private contractor.
 
 
 39
 On the other hand, the dissent written by Justice Barbieri, in which two other justices joined, effectively distinguished the federal precedent cited in the court's opinion and convincingly demonstrated that governmental employees could not be discharged solely because of their political views. If anything, the weakness of the majority position and the strength of the dissent were a warning much like a breeze rustling the leaves before a storm. In the following year, moreover, Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), dissipated what little strength the AFSCME opinion retained after the dissent's strong attack. In Perry, the United States Supreme Court made it quite plain that although a person had no right to government employment, it could not be denied because "of his constitutionally protected speech or associations." Id. at 597, 92 S.Ct. at 2697.
 
 
 40
 In short, by 1972 any reliance upon AFSCME v. Shapp as an authoritative exposition of federal constitutional law was indeed misplaced. Alomar v. Dwyer also had to be read with caution. That per curiam opinion by the United States Court of Appeals for the Second Circuit relied to a large extent upon the older case of Bailey v. Richardson, 182 F.2d 46 (D.C.Cir.1950), aff'd by an equally divided court, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352 (1951). The passage of time, the growing complaints against the patronage system, and more recent decisions of the Supreme Court in the public employment-first amendment context, however, cautioned against undue reliance upon Bailey v. Richardson. Similarly, in Nunnery v. Barber, Judge Butzner in a strong dissent said that a government employee could not be discharged solely because of the exercise of first amendment rights in associating with a particular political party.
 
 
 41
 At the time the plaintiff was discharged, therefore, there was some case law contrary to the Supreme Court's forthcoming decision in Elrod, but not without vigorous dissent. Moreover, positive support for Elrod's eventual holding had been given by the Court of Appeals for the Seventh Circuit in Illinois State Employees Union v. Lewis, 473 F.2d 561 (7th Cir. 1972), cert. denied, 410 U.S. 943, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). There the majority held that non-policymaking government employees could not be discharged merely because of their political affiliations. This holding, too, prompted a dissent, and the majority position provoked lively discussion among legal commentators.[3] Following its precedent in Lewis, the same court of appeals decided Burns v. Elrod, 509 F.2d 1133 (7th Cir. 1975), and the Supreme Court granted certiorari in 1975, the year before the plaintiff in this case was discharged.
 
 
 42
 Federal district judges were in no more agreement than their appellate colleagues. But as early as 1973, it had been determined in the same district in which the present case arose that a governmental employee could not be discharged because he refused to contribute to a political party. Bond v. County of Delaware, 368 F.Supp. 618 (E.D.Pa.1973).
 
 
 43
 Thus, a survey of decisional law demonstrates that from at least 1970, first amendment attacks on the patronage system by non-policymaking governmental employees were actively litigated in a number of courts. During that period of time, it is fair to say that there was no "clear past precedent" on which the litigants could justifiably have relied. There was precedent, but it was divided at best. See Kremer v. Chemical Construction Co., 623 F.2d at 789-90.
 
 
 44
 To have acted on the assumption that patronage discharges were constitutional was hazardous, particularly after 1975 when the Supreme Court granted certiorari to resolve the inconsistencies in the lower courts. At that point there could be no doubt that there was, at the very least, uncertainty. That should have alerted the defendants and prompted them to refrain from discharging an employee for political reasons at least until the Supreme Court resolved the constitutional issue.
 
 B.
 
 45
 The alternative aspect of the initial Chevron factor is whether Elrod decided an issue of first impression whose resolution was not clearly foreshadowed. The question whether patronage dismissals unconstitutionally abridged the first amendment rights of public employees was one of first impression in the Supreme Court. However, the first amendment analysis applied by the Court was not new. The majority relied on CSC v. Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), and United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 745 (1947), in holding that the various governmental interests said to be served by patronage were either insufficient to support the practice or could be accommodated by other less intrusive means. The real question in Elrod was whether the Court would apply this traditional first amendment balancing test to the practice of patronage. As then Judge Stevens pointed out in Illinois State Employees Union v. Lewis, the patronage system had survived historically because it had generally been assumed that a public employee had no right to a government job.
 
 
 46
 On several occasions the Supreme Court had held that although a person might not have a right to public employment, receipt of that benefit could not be conditioned on the relinquishment of a constitutional right. In Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), for example, the Court invalidated a requirement that state employees deny past or present association with Communists. A similar loyalty oath for school teachers was struck down on first amendment grounds in Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).
 
 
 47
 The same rationale led to the holding in Perry v. Sindermann that a state college professor could not be discharged because he exercised his first amendment right to publicly criticize the school administration's policies. The Court wrote that the government could not deny a benefit to a person on a basis that infringed his interest in freedom of speech. Otherwise his "exercise of those freedoms would in effect be penalized or inhibited." 408 U.S. at 597, 92 S.Ct. at 2697.
 
 
 48
 The lower federal courts that found discharges based on political affiliation constitutionally defective relied principally on Perry v. Sindermann. For example, Illinois State Employees Union v. Lewis and Bond v. County of Delaware held that the rationale of Perry and earlier cases logically led to the conclusion that continued employment predicated on surrender of associational rights violated the constitution.
 
 
 49
 The Supreme Court adopted this reasoning in Elrod. Although a plurality focused on the coercive effect of the patronage system, it was the other basis, that of unconstitutionally conditioning public employment, which commanded a majority. It is this narrow ground that represents the holding of the Court. Branti v. Finkel, 445 U.S. 507, 516, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980); Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977). From this perspective, Elrod was presaged by Perry v. Sindermann, decided four years earlier. While the dissent in Elrod characterized the holding as a dramatic break with the past, the majority expressed no similar sentiments, and it is the majority opinion that must be studied to determine if a new legal principle has been announced. See Dasho v. Susquehanna Corp., 461 F.2d 11, 20-21 (7th Cir.), cert. denied, 408 U.S. 925, 92 S.Ct. 2496, 33 L.Ed.2d 336 (1972). In my view, the first Chevron criterion has not been established.
 
 
 50
 The choice between retroactive and nonretroactive application is often a difficult one, and the analysis of the facts of each case with respect to the Chevron criteria is subject to differences of opinion.[4] In any event, the party seeking to avoid the usual application of retroactivity bears the burden of establishing the necessity for the exception, Cash v. Califano, 621 F.2d 626, 629 (4th Cir. 1980), and must show that all three factors favor his position. If proof fails as to one, then his burden has not been met. See Holzsager v. Valley Hospital, 646 F.2d 792, 797 (2d Cir. 1981), citing Kremer v. Chemical Construction Corp., 623 F.2d at 789-90. From my standpoint, the threshold element has not been satisfied, and thus, there would be no need to discuss the other two elements. Since the majority has addressed them, however, I shall briefly set out my views.
 
 II.
 
 51
 A retroactive application of Elrod will further the remedial policies announced in that case, and thus, the second Chevron criterion points to retroactivity. Unlike those decisions designed primarily to deter future illegal conduct, Elrod compensated an individual for an injury already suffered. Although I confess some doubt whether the second element cuts decisively one way or the other, I lean toward the view that to the extent similar claims are outstanding and viable, a retroactive application will further, not retard, the holding of the case.III.
 
 
 52
 I do not believe that substantial inequities would result if Elrod were made retroactive. The plaintiff's constitutional rights were violated and should be vindicated. It may be true that relief in the nature of rehire could impose some burdens on a governmental body. When the harm to the individual is weighed against the expense and inconvenience to a municipality, however, the balance must be struck in favor of the plaintiff. Thus, in Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), the Court said, "(E)ven where some constitutional development could not have been foreseen by municipal officials, it is fairer to allocate any resulting financial loss to the inevitable costs of government borne by all the taxpayers, than to allow its impact to be felt solely by those whose rights, albeit newly recognized, have been violated." Id. at 655, 100 S.Ct. at 1418. The Owen majority, in denying an immunity for a municipality, confronted and dismissed the very same arguments of inequity urged here.[5]
 
 
 53
 The Pennsylvania Supreme Court's quip in AFSCME, "those who, figuratively speaking, live by the political sword must be prepared to die by the political sword," 443 Pa. at 536, 280 A.2d at 378, was rejected by the United States Supreme Court in Elrod and again in Branti v. Finkel, 445 U.S. at 512 n.6, 100 S.Ct. 1287, 1291 n.6, 63 L.Ed.2d 574. Thus, the majority's argument that it is inequitable to allow a person who obtained his position through patronage to retain his job after his benefactors have lost their office really quarrels with the decision in Elrod itself. The fact that the plaintiff obtained his employment through patronage should not obscure the fact that the present incumbent also invoked that process and thus has no superior claim to the position. As between past and present employees, therefore, no compelling equities exist. Moreover, why the Elrod plaintiffs are entitled to a remedy, but the plaintiff here is not does not leap from the pages of the majority opinion. That difficult question, of course, is always one of the unanswerable issues in a nonretroactive decision.[6]
 
 
 54
 Serious reservations on the part of a court of appeals about the wisdom of a Supreme Court holding are not valid reasons to choose nonretroactivity. It has been said that the surest way to insure the repeal of an unwise statute is to enforce it to the letter. A somewhat similar argument could be made in favor of giving retroactive effect to a ruling with which a judge disagreed. However, I do not believe that either approach should bear on resolution of the retroactivity question.[7]
 
 
 55
 Thus, I disagree with the holdings of the majority and of the Courts of Appeals for the First and Fourth Circuits that Elrod should only be applied nonretroactively. Aufiero v. Clarke, 639 F.2d 49 (1st Cir. 1981); Ramey v. Harber, 589 F.2d 753 (4th Cir. 1978), cert. denied, 442 U.S. 910, 99 S.Ct. 2823, 61 L.Ed.2d 275 (1979). Retroactivity serves important jurisprudential ends which should not be lightly disregarded. The compelling reasons in Linkletter v. Walker, Chevron Oil Co. v. Huson, and the other cases which led the Supreme Court to deviate from its historic adherence to the common law rule are not present here and nonretroactivity is not justified. I would reverse the judgment of the district court.
 
 
 
 [1]
 Commissioner Catania resigned from office in April 1979; John Welsh was appointed as an interim commissioner. Both Catania and Welsh were named as defendants
 
 
 [2]
 The district court held that Marino's claim under 42 U.S.C. § 1986 must fail because it is dependent on § 1985 and because it was filed more than one year after the event and was therefore untimely. Marino's § 1988 claim was dismissed because that section creates no independent cause of action. The court also held that Marino's procedural due process claim could not be maintained because he failed to establish a legitimate claim of entitlement to his job under Pennsylvania law. None of these claims are before us on this appeal
 
 
 [3]
 A news story concerning the patronage dismissals in Pennsylvania at the time of this change in administration reported that when the Democrats regained control of the governor's seat in 1971, 3,500 Republican employees lost their jobs in a highway department "reorganization". It reported also that in the prior change of administration to the Republicans, 7,800 Democrats of an 8,000-person workforce in the highway department were replaced by Republicans. Taking the Politics Out of the Paycheck, Bus. Week, May 22, 1971, at 22
 
 
 [4]
 We do not believe that the grant of certiorari in Elrod v. Burns, 423 U.S. 821, 96 S.Ct. 33, 46 L.Ed.2d 37 (1975), before Marino's dismissal can be considered reasonable notice to Pennsylvania county officials that a major change in the state of the law was forthcoming
 
 
 [5]
 The Pennsylvania Manual 1978-1979 at 554-56 (G. Ackley & P. Arcuri eds. 1979)
 
 
 [6]
 Although the opinion in Retail Clerks Int'l Ass'n, Local 1357 v. Leonard, 450 F.Supp. 663 (E.D.Pa.1978), appears to be to the contrary, a close reading indicates that this is not really the case. The district court in Leonard believed that this court's decision in Rosenthal v. Rizzo, 555 F.2d 390 (3d Cir.), cert. denied, 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977), mandated retroactive application of Elrod. The Rosenthal opinion, however, did not address the issue of retroactivity. See Raggio v. Matunis, 489 F.Supp. 16, 18 (E.D.Pa.1979); Boyce v. School Dist. of Philadelphia, 447 F.Supp. 357, 360-61 (E.D.Pa.1978)
 
 
 [7]
 Our disposition of the retroactivity issue essentially answers Marino's claim that his discharge violated the First Amendment as it was construed in this context prior to Elrod. In this regard we agree with the First Circuit that "(o)ur conclusion that these cases did not clearly foreshadow Elrod necessarily means that we do not consider them to compel Elrod's result...." Aufiero v. Clarke, 639 F.2d at 52
 
 
 [8]
 If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators
 
 
 [1]
 See 1 W. Blackstone Commentaries, * 69; Note, Prospective Overruling And Retroactive Application In The Federal Courts, 71 Yale L.J. 907 (1962)
 
 
 [2]
 The Chevron Court also concluded that Rodrigue decided an issue of first impression whose resolution was not clearly foreshadowed. See 404 U.S. at 107, 92 S.Ct. at 355
 
 
 [3]
 E.g., 41 U.Chi.L.Rev. 297 (1974); 4 Loy.U.L.J. 459 (1973); 34 U.Pitt.L.Rev. 699 (1973); 7 Suff.L.Rev. 1098 (1973); 26 Vand.L.Rev. 1090 (1973)
 
 
 [4]
 Although the Supreme Court has made frequent use of nonretroactive decisions since Linkletter, the scholarly debate over the wisdom of that practice is a vigorous one. For a collection of materials on the subject, see R. Aldisert, The Judicial Process 877-938 (1976). An extended discussion and review of the principal cases may be found in Beytaugh, Ten Years Of Nonretroactivity: A Critique And A Proposal, 61 Va.L.Rev. 1557 (1975)
 The terms retroactive, nonretroactive, and prospective have been defined as presenting the issue whether a case that substantially alters the relevant body of prior law should govern (1) only future cases and neither the parties before the court nor any previous or pending cases ("prospectivity"), see, e.g., Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); (2) future cases as well as the litigants at bar but not previous or pending cases ("nonretroactivity"), see, e.g., Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), and Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); and (3) future cases, the present litigants, and all fact situations arising before the date of the law-changing decision that are still reviewable either by direct appeal or by collateral attack ("retroactivity"), see, e.g., Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).
 
 
 [5]
 Insofar as the defendants in their individual capacities are concerned, the defense of qualified immunity may offer reasonable protection. To defeat immunity, the plaintiff must do more than establish the "foreshadowing" that meets the Chevron test. He must show that the right was "clearly established." See Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); Reese v. Nelson, 598 F.2d 822 (3d Cir.), cert. denied, 444 U.S. 970, 100 S.Ct. 463, 62 L.Ed.2d 384 (1979). "Foreshadowing," as that term is used in Chevron Oil Co. v. Huson, does not address the concept of clearly established rights in the immunity context where different considerations apply. For example, the knowledge of the individual defendants is an important factor. See Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). A holding that the defendants did not act in derogation of a clearly established constitutional right and thus enjoy a qualified immunity would not be inconsistent with a determination that Elrod applies retroactively
 
 
 [6]
 Indeed, in the companion case of Weaver v. Bowers, 657 F.2d 1356 No. 80-1245, decided this day, the court reverses a judgment for the plaintiff primarily because it would be inequitable for him to recover when that right is denied Marino
 
 
 [7]
 As an illustration of the difficulty encountered in reaching principled decisions in nonretroactivity cases, Justice Harlan, a model of intellectual integrity, confessed,
 "I have in the past joined in some of those opinions (on nonretroactivity) which have, in so short a time, generated so many incompatible rules and inconsistent principles. I did so because I thought it important to limit the impact of constitutional decisions which seemed to me profoundly unsound in principle. I can no longer, however, remain content with the doctrinal confusion that has characterized our efforts to apply the basic Linkletter principle. 'Retroactivity' must be rethought."
 Desist v. United States, 394 U.S. 244, 258, 89 S.Ct. 1030, 1038, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting). See generally Wechsler, Toward Neutral Principles Of Constitutional Law, 73 Harv.L.Rev. 1 (1959).